**DICKSTEIN**SHAPIRO LLP

............... mericas  |  New York, NY 10036-2714
................... FAX (212) 277-6501  |  dicksteinshapiro.com

January 13, 2009

BY HAND

Honorable Lawrence M. McKenna
United States District Judge
Southern District of New York
500 Pearl Street
Room 1640
New York, New York 10007

      Re:     *United States v. Bernard L. Madoff*, 08 Mag. 2735

Dear Judge McKenna:

      Bernard L. Madoff respectfully submits this letter brief in opposition to the Government's motion to reverse the Order denying incarceration, issued by Magistrate Judge Ronald L. Ellis on January 12, 2009 (the "January 12 Order"), attached hereto as Exhibit 1.[1] Magistrate Judge Ellis correctly ruled that the Government failed to meet its burden of showing that pretrial incarceration is warranted in this case. Mr. Madoff's current, highly restrictive bail conditions fully assure his appearance in court and the safety of the community. Moreover, the additional conditions ordered by Magistrate Judge Ellis address any and all remaining concerns regarding Mr. Madoff's pretrial release. Because the Government fails to overcome the Bail Reform Act's presumption in favor of pretrial release, the Government's motion should be denied, and Magistrate Judge Ellis's decision affirmed.

      As Magistrate Judge Ellis observed, "[t]he issue at this stage of the criminal proceedings is not whether [Mr.] Madoff has been charged in perhaps the largest Ponzi scheme ever, nor whether [Mr.] Madoff's alleged actions should result in his widespread disapprobation by the public, nor even what is appropriate punishment after conviction." Exhibit 1 at 7-8. Instead, "[t]he legal issue before the Court is whether the Government has carried its burden of demonstrating that no condition or combination of conditions can be set that will reasonably assure [Mr.] Madoff's appearance and protect the community from danger. 18 U.S.C. § 3142(e)." Id. The Government completely failed to meet this burden in moving Magistrate Judge Ellis to order pretrial incarceration, and repeats its failure in the present motion.

---

[1] Mr. Madoff respectfully incorporates into this letter brief his revised letter brief to Magistrate Judge Ellis dated January 8, 2009, attached hereto as Exhibit 2.

**DICKSTEIN**SHAPIRO**LLP**

Honorable Lawrence M. McKenna
January 13, 2009
Page 2

The Government uses inflammatory rhetoric and hyperbole to obscure the context in which it is bringing this motion, namely that: (1) this is a pre-indictment arrest; (2) on a one-count complaint of securities fraud; (3) based on Mr. Madoff's alleged confession. The Government also improperly suggests that Mr. Madoff willfully ignored the terms of Judge Louis Stanton's Order in SEC v. Madoff and Bernard L. Madoff Investment Securities LLC, 08 Civ. 10791 (LLS) (the "SEC Order"), and thereby obstructed justice under the Bail Reform Act.[2] To the contrary, at its core, this was a father's awkward attempt to reconnect with his estranged children, and an attempt by Mr. and Mrs. Madoff to reach out to close family members and Mr. and Mrs. Madoff's closest friends - a married couple. In doing so, Mr. Madoff made an isolated mistake, which he realized after speaking with counsel, and which he promptly rectified with counsel's assistance by recalling all the gifted items.

The Government's argument against release rests solely on the claim that Mr. and Mrs. Madoff's honest mistake in gifting certain items of jewelry and watches to their family and closest friends constitutes a change in circumstances warranting incarceration. In fact, the only changed circumstance here is the Government's cynical decision to backtrack on its agreement with Mr. Madoff regarding the terms of his bail.[3] Realizing that the gifting of jewelry and watches is not enough, the Government also attempts to portray as new revelations facts known to it before negotiating and agreeing to the original terms of release. Specifically, the Government points to checks totaling approximately $173 million that were found in Mr. Madoff's office desk when his office was searched the day of his arrest. See Government's letter brief, filed on January 13, 2009 ("January 13 letter"), at 6. According to the complaint in this case, which was filed on December 11, 2008, these checks were intended as payments to certain employees, family and friends. Complaint filed in U.S. v. Madoff, 08 Mag. 2735 ("Complaint"), at 4. These checks were obviously never sent out, and the Government has never argued or even suggested that Mr. Madoff has sent or attempted to send these or any other checks to anyone since his arrest. Indeed, the Government was aware of these checks before it agreed on three occasions not to seek incarceration. In short, the Government's strained attempt to characterize the gifting of jewelry and watches as a change in circumstances, and its inexplicable invocation of facts known in advance of agreeing to the original release conditions, are not a sufficient basis for pretrial incarceration. As Magistrate Judge Ellis notes, "[i]t may be interesting and provocative, but has limited probative value regarding the issues before the Court." Exhibit 1 at 12, n. 9.

---

[2] To be clear, prior to the January 12 Order, the SEC Order was not incorporated into Mr. Madoff's bail conditions, and as stated by Magistrate Judge Ellis, the Government did "not identify any violation of the conditions of release, and no violation [was] apparent." Exhibit 1 at 7, n. 6. Nor have they done so in their instant application to this Court.

[3] As Magistrate Judge Ellis notes, "[t]his case contains many unusual tidbits, most of which present no new or changed information." Exhibit 1 at 12, n. 9.

**DICKSTEIN**SHAPIRO<sub>LLP</sub>

Honorable Lawrence M. McKenna
January 13, 2009
Page 3

The Government improperly seeks to punish Mr. Madoff, rather than prevent future harm as contemplated by the Bail Reform Act.  Indeed, the Government makes virtually no attempt to prove that Mr. Madoff poses any, let alone a *serious*, risk of flight.  Similarly, the Government fails to show by a preponderance of the evidence that Mr. Madoff presents a serious risk of obstructing justice.[4]  However, even if the Government were successful in showing either a serious risk of flight or obstruction of justice, the Government cannot, and indeed has not, met its burden of demonstrating that no condition or combination of conditions will reasonably assure his appearance in court and the safety of the community.  In fact, Mr. Madoff's release is subject to an extensive list of stringent and unique conditions carefully calculated to address the Government's concerns, as follows:

1.  A $10 million personal recognizance bond signed by Mr. Madoff, his wife, and his brother, and secured by confessions of judgment on properties in New York, N.Y., Montauk, N.Y., and Palm Beach, Fl. worth a total of over $19 million;

2.  The surrender of Mr. and Mrs. Madoff's passports;

3.  Other than for scheduled court appearances, Mr. Madoff's confinement to home detention in his Manhattan apartment 24 hours a day, 7 days a week, with an electronic monitoring device attached to his ankle;

4.  Employment at his wife's expense of a security firm acceptable to the Government, Casale Associates ("Casale"), led by a decorated retired senior officer of the New York Police Department, to provide the following services to prevent harm and flight:

    a.  round-the-clock monitoring at his building, 24 hours a day, 7 days a week, including video monitoring of all of the apartment doors;

    b.  implementation of a "flight protocol" which requires the armed guard to immediately notify 911 and the F.B.I. in the event of a suspicion of harm or flight;

---

[4] The Government's immediate request for a stay of the January 12 Order, which was granted, prevented the imposition of additional bail restrictions on Mr. Madoff and his assets.  These actions further belie the Government's claim that Mr. Madoff poses any risk of flight or obstruction of justice.  If the risk of future obstruction of justice is as great as the Government suggests, then they surely should not have requested the court to keep the current, purportedly insufficient conditions, in place.

**DICKSTEIN**SHAPIRO LLP

      c.   an armed guard stationed in a car outside of Mr. Madoff's residence 24 hours a day, 7 days per week who, among other things, monitors the panic button[5];

      d.   additional guards upon request if necessary to prevent harm or flight; and

      e.   implementation of a transportation protocol to secure safe travel to and from the courthouse when Mr. Madoff is required to appear in court.

Furthermore, Magistrate Judge Ellis imposed the following additional conditions in the January 12 Order, all of which are acceptable to Mr. Madoff:

1.   Incorporation of the restrictions set forth in the SEC Order, including restrictions on transfer of all property whatsoever, wherever located, in the possession or under the control of Mr. Madoff or Bernard L. Madoff Investment Securities LLC ("BMIS"). In addition, the SEC Order appointed Irving H. Picard, Esq. as the Securities Investor Protection Corporation ("SIPC") Trustee for BMIS, and appointed Lee Richards, Esq. as the receiver for the assets of Madoff Securities International Ltd., Madoff Ltd., and any other foreign entity operated by Mr. Madoff. Additionally, pursuant to the SEC Order, all bank accounts owned by Mr. Madoff, jointly owned by Mr. Madoff and his wife, and owned by any of the above-referenced Madoff companies, have been frozen.

2.   Incorporation of the restrictions set forth in the voluntary restraint agreement signed by Mrs. Madoff on December 26, 2008, which prevents Mrs. Madoff from transferring any property or other interest belonging to her and freezes her bank accounts.[6] She must itemize and provide receipts of all expenses to the United States Attorney's Office at the end of each month.

3.   Mr. Madoff must compile an inventory of all valuable portable items in his Manhattan home. In addition to providing this inventory to the Government, Casale, or another security company approved by the Government, shall check the inventory every two weeks. Casale, or another security company approved by the Government, shall search all outgoing physical mail to ensure that no property has been transferred. The

---

[5] The panic button is a communication device installed in Mr. Madoff's apartment that allows Mr. Madoff to immediately notify the armed guard of any suspicious activity.

[6] The voluntary restraint letter provides a fixed allowance to pay basic monthly living expenses, maintain the insurance on certain properties, pay legal fees, and satisfy the costs of outside security.

**DICKSTEIN**SHAPIRO LLP

Honorable Lawrence M. McKenna
January 13, 2009
Page 5

> Government and Mr. Madoff are to agree on a threshold value for inventory items within one week of the Order.[7]

Exhibit 1, at 1-2, 25.

The Government's brief is remarkable for its utter failure to provide any reasons why the combination of the foregoing conditions is insufficient to assure Mr. Madoff's appearance in court and the safety of the community. The Court should therefore reject the Government's appeal.

STANDARD OF REVIEW

In reviewing a magistrate judge's pretrial detention order, the district court must determine the matter *de novo*. See U.S. v. Leon, 766 F.2d 77, 80 (2d Cir. 1985); U.S. v. Smith, 2002 WL 31521159, at *1 (S.D.N.Y. Nov.13, 2002)).

**Background**

**A.      Arrest, Negotiation of and Agreement on Conditions of Bail**

According to the Complaint, on December 10, 2008, Mr. Madoff confessed to his two sons, his brother, and his wife that his investment advisory business was a fraud and that he intended to turn himself in to the authorities shortly. Out of an exercise of caution, he advised his sons to seek legal advice, although they did not participate in the alleged fraud. In all likelihood, Mr. Madoff understood that his sons would be advised to report his alleged fraud to the authorities and that his arrest was imminent. Indeed, the next day, Mr. Madoff was arrested on the Complaint and charged with one count of securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5. According to the Complaint, at the time of his arrest, he indicated that he expected to be arrested and voluntarily admitted his culpability to the F.B.I.[8]

At his arraignment before Magistrate Judge Douglas F. Eaton on December 11, 2008, the

---

[7] Significantly, Mr. Madoff began compiling an inventory of valuable portable property even before the Order was issued.

[8] When Mr. Madoff's office was searched shortly after his arrest, a number of checks were found in his office desk, totaling approximately $173 million. January 13 letter, at 6. Mr. Madoff allegedly planned to use that money to make payments to certain employees, family, and friends. Complaint, at 4. In moving to revoke Mr. Madoff's pretrial release, the Government has suddenly raised this fact, despite being well aware of it before negotiating and agreeing to release Mr. Madoff on bail.

**DICKSTEIN**SHAPIRO LLP

Honorable Lawrence M. McKenna
January 13, 2009
Page 6

Government did not seek to remand Mr. Madoff, nor did Pre-Trial Services recommend detention.[9]  Initially agreed to and imposed on December 11, 2008, Mr. Madoff's bail conditions were subsequently modified, upon the agreement of both parties, on December 17, 2008 and December 19, 2008.  At no point during this time did the Government seek to incarcerate Mr. Madoff.[10]

## B.   Gifting of Jewelry and Watches

On the evening of December 24, 2008, in an effort to reach out to their immediate family and to close friends – a married couple - with whom contact had been cut off, Mr. and Mrs. Madoff decided to send a number of sentimental personal items to a few individuals via United States mail.  Although Mr. Madoff had consented to the SEC Order, which prohibited Mr. Madoff from transferring assets, he simply did not realize that it pertained to these personal items.  That evening, on Christmas Eve, Mrs. Madoff, who was not subject to the SEC Order, set aside some pieces of jewelry that she had accumulated over the course of 49 years of marriage to Mr Madoff.  She intended to share these meaningful items with her closest friends and family.  For the same reason and at the same time, Mr. Madoff gathered a number of watches that he had collected over the course of years, knowing that, due to the sudden change in his circumstances, he would never have an occasion to wear these watches again.  To Mr. and Mrs. Madoff, the value of these items was purely sentimental.  All of these items were mailed in gift packages to their sons, to their daughters-in-law, to Mr. Madoff's brother and sisters-in-law, his grandchildren, and a married couple who were two of the Madoff's closest friends.

On December 30, 2008, Mrs. Madoff met with counsel.  As a result of that meeting, Mr. and Mrs. Madoff immediately made every effort to recover the jewelry and watches.  They contacted Mr. Madoff's brother and sister-in-law and, through counsel, secured the return of the jewelry and watches.  They also asked Mrs. Madoff's sister to return the items sent to her, which she has done.  The Madoffs also attempted to reach the married couple, who were out of town at the time.  Counsel sent a letter to them via Federal Express requesting the return of the items sent to them.  We have been advised by counsel to this couple that he has the pieces of jewelry and awaits direction from the Government as to what he should do next.  It is our understanding that the balance of the jewelry and watches has been recovered by the Government.

---

[9] Instead, Pre-Trial Services recommended even less restrictive terms of release than those agreed to by the parties.

[10] For a full recitation of Mr. Madoff's current bail conditions, see p. 3-4, *supra*.

**DICKSTEIN**SHAPIRO<sub>LLP</sub>

Honorable Lawrence M. McKenna
January 13, 2009
Page 7

## <u>Applicable Law</u>

### A. Statutory Requirements

In accordance with the Eighth Amendment's prohibition against excessive bail, 18 U.S.C. § 3142(b) (the "Bail Reform Act") requires that a defendant be released on a personal recognizance or unsecured appearance bond "unless the [court] determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." <u>See</u> <u>U.S. Const. amend VIII</u> ("Excessive bail shall not be required . . ."); <u>see also</u> <u>U.S. v. Sabhnani</u>, 493 F.3d 63, 75 (2d Cir. 2007). Because the Bail Reform Act "limits the circumstances under which a district court may order pretrial detention," the Second Circuit has observed that unless the defendant has been charged with certain crimes enumerated in 18 U.S.C. § 3142(f),[11] the Government may move to seek such detention only "when there is a *serious risk* that the defendant will flee, or obstruct or attempt to obstruct justice." <u>U.S. v. Friedman</u>, 837 F.2d 48, 49 (2d Cir. 1988) (emphasis added) (citing § 3142(f)(2)); <u>see also</u>, S. Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3189 (stating that "there is a small but identifiable group of particularly *dangerous* defendants as to whom neither the imposition of stringent release nor the prospect of revocation of release can reasonably assure the safety of the community or other persons").

Magistrate Judge Ellis correctly summarized the legal standard in this case:

> Presented with a motion for detention, the Court undertakes a two-step inquiry. "First, the court must determine whether the Government has established 'by a preponderance of the evidence that [Madoff] . . . presents a risk of flight or obstruction of justice.'" <u>United States v. Khashoggi</u>, 717 F. Supp. 1048, 1049 (S.D.N.Y. 1989) (quoting <u>United States v. Friedman</u>, 837 F.2d 48, 49 (2d Cir. 1988)). If the Government carries this initial burden, the Court must determine whether there are reasonable conditions of release that can be set or whether detention is appropriate. Friedman, 837 F.2d at 49; <u>United States v. Berrios-Berrios</u>, 791 F.2d 246, 250 (2d Cir. 1986), <u>cert. dismissed</u>, 479 U.S. 978; 18 U.S.C. § 3142(c). To support detention based on danger, the Government's proof must be clear and convincing, 18 U.S.C. § 3142(f)(2), while detention based on

---

[11] These crimes include crimes of violence carrying a maximum term of ten years or more; offenses for which the maximum sentence is life imprisonment or death; serious drug offenses; felonies committed by certain repeat offenders; and felonies that are not otherwise crimes of violence that involve a minor victim or the possession or use of a firearm, destructive device or any other dangerous weapon. 18 U.S.C. § 1342(f)(1). None of these crimes are at issue in this case.

**DICKSTEIN**SHAPIRO LLP

Honorable Lawrence M. McKenna
January 13, 2009
Page 8

risk of flight must be proven by a preponderance of the evidence. United States v. Shakur, 817 F.2d 189, 195 (2d Cir. 1987) (citing United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985); United States v. Gotti, 794 F.2d 773, 777 (2d Cir. 1986)). Furthermore, in making this determination, the Court must consider a set of four factors established by Congress. See 18 U.S.C. § 3142(g). These include "'the nature of the offense, the weight of the evidence against the suspect, the history and character of the person charged, and the nature and seriousness of the risk to the community.'" Khashoggi, 717 F. Supp. at 1049 (quoting Chimurenga, 760 F.2d at 403). The Government's task is not insubstantial at this second stage. In most cases, release is the presumptive state. See 18 U.S.C. §§ 3142 (b) and (c). "The court should also 'bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial.'" Khashoggi, 717 F. Supp. at 1049 (quoting Shakur, 817 F.2d at 195).

Exhibit 1, at 9-10.

**Argument**

**A. Mr. Madoff Poses No Risk of Flight**

The Government failed to satisfy the requirements of the Second Circuit's two-step inquiry in determining whether detention is warranted, pursuant to 18 U.S.C. § 3142. First, the Government's motion does not demonstrate that Mr. Madoff poses *any*, let alone a "serious" risk of flight. Indeed, as Magistrate Judge Ellis notes, "[a]side from the bare assertion that there remains some risk of flight, the Government has failed to articulate any flaw in the current conditions of release." Exhibit 1, at 13. Mr. Madoff's current conditions of release and the additional restrictions ordered by Magistrate Judge Ellis, as set forth above, and the unprecedented notoriety of this case, render flight virtually impossible. The fact that the Government addresses risk of flight primarily in a single footnote evidences the Government's lack of confidence in the validity of its own position. In the footnote, the Government lists three purported facts in support of its argument: (1) the strength of the case against Mr. Madoff; (2) his alleged willingness to disregard a court order; and, (3) the scope of Mr. Madoff's alleged conduct. January 13 letter at 6, n.4. Facts (1) and (3) are actually one and the same, and in any event, each of these facts were known by the Government when it negotiated and agreed to Mr. Madoff's bail conditions on three separate occasions.[12] As for fact (2), "the Government fails to explain how the transfers [of jewelry and watches] change the calculus with respect to the question of risk of flight." Exhibit 1, at 12. Accordingly, the Government has not met its burden of establishing that Mr. Madoff poses a serious risk of flight.

---

[12] Indeed, the strength of the Government's case rests solely on the voluntary confessions he allegedly made to his sons and to the F.B.I.

**DICKSTEIN** SHAPIRO LLP

Honorable Lawrence M. McKenna
January 13, 2009
Page 9

## B. Mr. Madoff Poses No Risk of Obstruction of Justice

Absent a showing of a serious risk of flight, the Government must show a serious risk of obstruction of justice by a preponderance of the evidence. 18 U.S.C. §3142(f)(2). It is clear from the facts of this case that Mr. Madoff poses no such risk. The Government incorrectly suggests that a purported dissipation of funds constitutes obstruction of justice within the plain meaning of 18 U.S.C. § 3142(f)(2)(B).[13] Furthermore, the Government fails to cite *any* caselaw in support of its argument that the transfer of jewelry and watches is an obstruction of justice under the Bail Reform Act. In fact, the language of 18 U.S.C. § 3142(f)(2)(B) focuses on a risk that a defendant threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror, conduct that is not at issue in this case. This Circuit's caselaw is consistent with this reading of the statute. Specifically, in the context of the Bail Reform Act, courts find a serious risk of obstruction of justice primarily in cases involving physical threats to jurors, prosecutors, witnesses, and law enforcement officers. See U.S. v. Schwamborn, 2007 WL 2932061, at *1 (2d Cir. Oct. 9, 2007) (denying bail based on the probability that the defendant would obstruct justice, in light of the defendant's threats and plans to injure witnesses, among others, and his relation to an organized crime family); U.S. v. Ruggiero, 796 F.2d 35, 36 (2d Cir. 1986) (denying bail where the court observed the defendant's threats to witness and the prosecutor, and evidence showed the defendant had participated in organized crime activities while released on bail); U.S. v. Payden, 768 F.2d 487, 490-91 (2d Cir. 1985) (denying bail where the defendant attempted to arrange the murder of a government witness and her daughter); U.S. v. Leon, 766 F.2d 77,81-82 (denying bail where the defendant threatened prospective witnesses, and had a tendency to carry a loaded firearm); U.S. v. Stevens, No. 04-CR-222S, 2005 WL 483387, at *3 (W.D.N.Y. Mar. 2, 2005) (denying bail where the defendant threatened or intimidated a prospective witness). A court has also found a serious risk of obstruction of justice in a situation where the defendant committed perjury during a suppression hearing while released on bail. U.S. v. Bazuaye, 2003 WL 22965071 (2d Cir. Dec. 12, 2003). Hence, neither the Bail Reform Act, nor the relevant caselaw support the Government's assertion that the gifting of jewelry and watches in this case amounts to obstruction of justice.

Finally, even if the Government could show that the gifting of jewelry and watches is obstruction of justice through dissipation of potential restitution funds, it fails to show that there is a *serious* risk of such dissipation here. As Magistrate Judge Ellis observes, "[t]he question is not simply whether Madoff's actions can be considered obstruction, but whether there is a *serious* risk of obstruction in the future." Exhibit 1, at 14-15 (emphasis in the original). Indeed, "[t]he statute, by its nature, is always looking forward." Id. First, Mr. Madoff did not seek to willfully contravene the terms of the SEC Order, or attempt to conceal the gifting of jewelry and

---

[13] Mr. Madoff in no way concedes that the gifting of jewelry and watches in this case constitutes a dissipation of restitution funds.

**DICKSTEIN**SHAPIRO LLP

Honorable Lawrence M. McKenna
January 13, 2009
Page 10

watches. To the contrary, he sent these items to his sons, knowing that, as they were the very people who reported him to the authorities, they would likely notify the Government of any improper conduct. Second, shortly after his arrest, Mr. Madoff's counsel contacted the counsel for the SIPC Trustee and, at Mr. Madoff's request, offered to relinquish many of his and his wife's assets, including properties in Palm Beach, Fl. and Antibes, France, as well as his boats and cars. Contrary to what the Government alleges, these are hardly the actions of a man seeking to obstruct justice by improperly "redistributing his wealth."[14]  Jan. 13 Letter, at 6.

The Government has the additional burden of proving that there is no condition or combination of conditions that will reasonably prevent dissipation of such property. See 18 U.S.C. § 3142(e). The Government failed to make this showing because Mr. Madoff's bank accounts and those of his wife are frozen, the U.S. real property is encumbered, and there is a number of ways, approved and adopted by Magistrate Judge Ellis, in which valuable portable property can be secured short of Mr. Madoff's incarceration.

## C. Gifting of Jewelry and Watches Does Not Pose a Danger to the Community

Fundamentally, the Government's claim that Mr. Madoff could cause harm by dissipating restitution assets is groundless. As part of the two-step inquiry, in the event the Government proves by a preponderance of the evidence that Mr. Madoff poses either a serious risk of flight or poses a serious risk of obstruction of justice, it is the Government's burden to then show by clear and convincing evidence that Mr. Madoff poses a danger to the community. 18 U.S.C. § 3142(f)(2). Magistrate Judge Ellis correctly articulates the Government's burden in demonstrating dangerousness:

> Were the Government to succeed under the serious risk of flight or obstruction of justice test discussed above, to prove its burden here it must affirmatively answer each prong of a three part inquiry. First, the Government must show economic harm is a danger to the community cognizable under the Bail Reform Act, as codified in 18 U.S.C. § 3142; succeeding in that, the Government must next establish the potential for Madoff to execute actions that would merit economic harm for these purposes; proving that, the Government must then prove by the relevant standard of clear and convincing evidence that no "condition or combination of conditions" can adequately mitigate the danger, save detention of Madoff.

---

[14]  The transfers at issue now were intended to be nothing more than personal gifts. Indeed, Mr. Madoff did not attempt to profit from the transfers, nor has he attempted to sell any other personal effects. Given the asset freezes, voluntary restraint on his wife's assets, and the notoriety of this case, we submit it would be virtually impossible to do so.

**DICKSTEIN**SHAPIRO LLP

Honorable Lawrence M. McKenna
January 13, 2009
Page 11

Exhibit 1, at 16-17.

We respectfully disagree with Magistrate Judge Ellis's determination that "there is support for considering economic harm in evaluating danger to the community under § 3142 of the Bail Reform Act." Exhibit 1, at 19. Magistrate Judge Ellis primarily relies on cases (1) from outside of this jurisdiction; (2) inconsistent with the legislative history and purpose of the Bail Reform Act; and (3) factually distinct and, in most instances, are cited for pronouncements that are dicta.[15] These factors undermine the precedential value of cited caselaw as applied here.[16]

But even assuming that economic harm is a cognizable danger within the meaning of the Bail Reform Act, as Magistrate Judge Ellis himself points out, "the scope of this factor remains uncertain." Exhibit 1, at 22. Although the Bail Reform Act is barren of any mention of economic harm in the context of danger to the community, were the Court to determine that the statute is ambiguous on this point, the rule of lenity would apply. It is a well established principle that ambiguity of criminal statutes should be resolved in favor of defendants. See U.S. v. Bass, 404 U.S. 336 (1971); U.S. v. Simpson, 319 F.3d 81 (2nd Cir. 2003); U.S. v Tavares, 166 F.Supp.2d 903 (S.D.N.Y. 2001). When applied to this case, the principle of lenity argues strongly against making a finding of dangerousness on the basis of perceived economic harm.

Assuming, however without conceding, that economic harm is contemplated under the Bail Reform Act, the Government must still prove that Mr. Madoff's conduct rises to the level of such economic harm. Magistrate Judge Ellis correctly ruled that, "[h]ere, the Government fails to provide sufficient evidence that any potential future dissemination of Madoff's assets would rise to the level of an economic harm cognizable under § 3142 of the Bail Reform Act." Exhibit 1, at 22. The court emphasizes that "it is far too great an extension to reach from the cases presented by the Government that narrowly recognize the possibility of economic harm (and rarely conclude the economic harm presented rises to the level of a danger to the community for which

---

[15] See Exhibit 2 for a detailed discussion distinguishing the remainder of cases cited by the Government from the case at hand.

[16] For example, in U.S. v. Stein, 2005 WL 3071272 (S.D.N.Y. Nov. 15, 2005), Judge Lewis Kaplan does not even reach the question of whether economic harm could constitute danger to the community within the meaning of the Bail Reform Act. Rather, the court analyzes danger to the community based on non-violent witness tampering. Id. at *2. Additionally, in U.S. v. Parr, 399 F.Supp. 883 (W.D.Tex. 1975), a case involving post-conviction bail determination, the court considered pecuniary harm to the community, which stemmed from the defendant's ongoing political influence, allowing him to continue to misappropriate the community's assets, the very crime for which he was convicted. Here, the Government does not argue that Mr. Madoff's gifting of jewelry and watches was a crime. Further, unlike Parr, Mr. Madoff's conditions of release prevent any further transfer of assets.

**DICKSTEIN**SHAPIRO LLP

Honorable Lawrence M. McKenna
January 13, 2009
Page 12

someone should be detained) to such a conclusion based on the minimal evidence presented here by the Government." Id.

Finally, the Government also fails the third prong of the dangerousness test. Namely, the Government has completely failed to show by clear and convincing evidence that the bail conditions currently in place, in addition to those ordered by Magistrate Judge Ellis, do not reasonably assure the safety of the community.[17] Even if dissipation of assets could rise to the level of economic harm, no economic harm could occur in the future in light of the stringent restrictions imposed on Mr. Madoff: his bank accounts are frozen, the real properties are pledged, his businesses are in receivership, he is under house arrest, subjected to constant video and electronic surveillance, monitored by armed guards 24 hours a day, 7 days per week, and, if Magistrate Judge Ellis's Order is affirmed, all outgoing physical mail will be searched, and all valuable portable items will be inventoried and monitored on a bi-weekly basis. The Government makes no attempt to show why or how these conditions are insufficient to reasonably assure Mr. Madoff's appearance in court and the safety of the community.

---

[17] As Magistrate Judge Ellis stated "[t]he Government has failed to meet the additional burden of proving by clear and convincing evidence that there is no condition or combination of conditions that will reasonably prevent dissipation of such property. See 18 U.S.C. § 3142(e). In fact, its failure to respond to the various additional bail conditions presented by Madoff further supports the weakness of its argument and its inability to show why Madoff's detention would markedly ameliorate any alleged danger to the community that may result from dissipation of his assets." See Exhibit 1, at 24.

**DICKSTEIN** SHAPIRO LLP

Honorable Lawrence M. McKenna
January 13, 2009
Page 13

<u>CONCLUSION</u>

      For all of the foregoing reasons, we respectfully submit that the Court should deny the Government's motion to reverse Magistrate Judge Ellis's Order denying Mr. Madoff's incarceration.

                    Respectfully submitted,
                    DICKSTEIN SHAPIRO LLP

                    By:
                    Ira Lee Sorkin

                    By:
                    Daniel J. Horwitz

Of Counsel:
Nicole De Bello
Ketevan Kulidzhanova
Bradley M. Brown

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,                          :

                        - against -                :          **OPINION AND ORDER**

BERNARD L. MADOFF,                                 :          **08 Mag. 2735**

                                    Defendant.     :

RONALD L. ELLIS, United States Magistrate Judge:

## I. INTRODUCTION

Before the Court is a motion by the Government to detain Defendant Bernard L. Madoff pending trial on the grounds that: 1) the facts in this case present a clear risk of flight and obstruction of justice and 2) neither the current conditions of release, nor any other conditions that could be imposed, are sufficient to protect the safety of the community. The Government argues that Madoff's recent transfers of valuable items to third parties constitutes a change in circumstances that render his current bail conditions, and any other bail conditions that might subsequently be imposed, insufficient to insure against risk of flight and danger to the community. Because the Government has failed to meet its legal burden, the motion is **DENIED**. The Court finds, however, that the following additional conditions shall be imposed to address the identified concerns:

> (1) The restrictions set forth in the preliminary injunction entered on December 18, 2008, in the civil case brought by the SEC before District Judge Louis L. Stanton, including restrictions on transfer of all property whatsoever, wherever located, in the possession or under the control of Madoff, **SHALL** be incorporated into the current bail conditions;

> (2) The restrictions set forth in the voluntary restraint agreement signed by Mrs. Madoff

on December 26, 2008, **SHALL** be incorporated into the current bail conditions; and

(3) Madoff **SHALL** compile an inventory of all valuable portable items in his Manhattan home. In addition to providing this inventory to the Government, Casale Associates, or another security company approved by the Government, **SHALL** check the inventory once every two weeks. Casale Associates, or another security company approved by the Government, **SHALL** search all outgoing physical mail to ensure that no property has been transferred. The Government and Madoff shall agree on a threshold value for inventory items within one week of this Order.

## II. BACKGROUND

On December 11, 2008, the Government initiated the instant criminal case via a Complaint charging Madoff with one count of securities fraud in violation of 15 U.S.C. __ 78j(b), 78ff; 17 C.F.R. _ 240.10b-5. Upon his arrest, Madoff was interviewed by Pretrial Services, which did not recommend pretrial detention. (Defendant's Memorandum in Opposition ("Def. Opp."), Jan. 8, 2009, at 1-2.) At presentment, the Government did not seek detention, and the Parties jointly proposed a set of bail conditions, so ordered by the Honorable Douglas F. Eaton on December 11, 2008.[1] (*Id.*) After a series of amendments,[2] which added conditions to

---

[1] The original conditions presented by the Parties were: (1) a $10 million personal recognizance bond to be secured by Madoff's Manhattan apartment (valued at approximately $7 million), and to be cosigned by four financially responsible persons, including Madoff's wife; (2) surrender of Madoff's passport; (3) travel restricted to

bail or adjusted dates by which certain conditions were to be met, the bail conditions currently in effect were entered on December 19, 2008.[3] They are:

> (1) a $10 million personal recognizance bond secured by Madoff's Manhattan apartment, and Madoff's wife's properties in Montauk, New York, and Palm Beach, Florida, and co-signed by two financially responsible persons, Madoff's wife and brother;

---

the Southern and Eastern Districts of New York and the District of Connecticut; and (4) release upon Madoff's signature and that of his wife, with the remaining conditions to be fulfilled by December 16 at 2:00 p.m. (Government's Memorandum ("Gov. Mem."), Jan. 6, 2009, at 1-2.).

[2] On December 17, 2008, the Government presented the Parties' joint proposal of certain additions and modifications. This joint proposal was so ordered by the Honorable Gabriel W. Gorenstein. (*See* Marc O. Litt's Letter to the Court, Dec. 17, 2008 (Docket No. 7).)

[3] By letter dated December 19, 2008, the Government submitted the jointly proposed bail conditions modifications. (Marc O. Litt's Letter to the Court, Dec. 19, 2008 (Docket No. 10).) The Government provided a comprehensive list of the bail terms, including proposed additional conditions, and The Honorable Theodore H. Katz so ordered this joint proposal. (*Id.*)

(2) the filing of confessions of judgment with respect to Madoff's Manhattan apartment and his wife's properties in Montauk, New York, and Palm Beach, Florida;

(3) other than for scheduled court appearances, Madoff is subject to home detention at his Manhattan apartment, 24 hours per day, with electronic monitoring;

(4) Madoff employs, at his wife's expense, a security firm acceptable to the Government, to provide the following services to prevent harm or flight:

> (a) the security firm provides round-the-clock monitoring at Madoff's building, 24 hours per day, including video monitoring of Madoff's apartment doors, and communications devices and services permitting it to send a direct signal from an observation post to the Federal Bureau of Investigation in the event of the appearance of harm or flight;

> (b) the security firm will provide additional guards available on request if necessary to prevent harm or flight;

(5) Madoff and his wife have surrendered their passports.

(*See* Docket No. 10.)

In a related civil proceeding before The Honorable Louis L. Stanton brought by the Securities and Exchange Commission ("SEC") against Madoff and Bernard L. Madoff Investment Securities LLC, the Parties entered into a preliminary injunction on December 18, 2008, pursuant to which Madoff was explicitly enjoined from transferring any assets belonging to

him or his company. (Order on Consent Imposing Preliminary Injunction, Freezing Assets and Granting Other Relief Against Defendants, Dec. 18, 2008, *SEC v. Madoff, et al.*, No. 08 Civ. 10791 (LLS) (Docket No. 8).) This injunction requires Madoff to "prevent any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment or other disposal of any assets, funds, or other property (including money, real or personal property, securities, commodities, choses in action or other property of any kind whatsoever) of, held by or under the direct or indirect control of, Defendant . . . ." (*Id.* at 3.) This preliminary injunction was not a condition of bail, nor was it incorporated into Madoff's conditions of release on bail.

Subsequently, on or around December 24, 2008, Madoff and his wife mailed packages to family and to friends. The contents of these packages have been characterized by Madoff as "gifts" and items of "sentimental value."[4] (Def. Opp. at 3-4.) Upon learning of these transfers, the Government sought a hearing to request that Madoff be detained pending trial. According to the Government, the transfers at issue contained personal property that was clearly under Madoff's control, and the value of the items may exceed $1 million.[5] The Government argues that a handwritten note contained in one package and authored by Madoff presents further proof that these items were in Madoff's possession and control. (Transcript of January 5, 2009, Hearing ("Tr.") at 4-5.) The Government concludes that these actions, which it describes as the

---

[4] The Government is rightly skeptical of this claim. It is highly suspect that a man as sophisticated as Madoff appears to be did not pause to consider the possible ramifications of this proposed course of action on his release conditions. Given Madoff's failing in this regard, it is appropriate that his ability to transfer property be restricted as completely as possible.

[5] Madoff does not take issue with this valuation. Indeed, the force of the Government's argument would not be materially diminished if the value were less than suggested unless the value clearly was negligible.

dissipation of personal assets, violated the preliminary injunction in place in the civil case against Madoff, and constitute an obstruction of justice cognizable under 18 U.S.C. _ 3142. (*Id.* at 30 ("Here the obstruction that we see is the inability to get restitution and forfeiture proceedings to victims . . . .").) Building on this argument, the Government asserts that this type of economic harm represents a danger to the community as contemplated by _ 3142 of the Bail Reform Act.

The Government further maintains that Madoff's violation of the preliminary injunction has heightened significance because it occurred within one week of the issuance of the injunction and clearly indicates his lack of respect for the limits put in place by the Court. (Tr. at 4-5.) The Government concludes that the continued pretrial release of Madoff poses a clear risk of flight and obstruction of justice, as well as a danger to the safety of the community, which includes victims of Madoff's alleged fraud.

Madoff argues that he has not violated the conditions of his bail. He admits that personal items, several of which belonged to his wife, who is not a party to either the criminal or civil case against him, were mailed to some family members and one couple – friends of Madoff and his wife. Madoff asserts that these items were holiday gifts and heirloom pieces of sentimental value, and were sent without an intent to violate any court order. Madoff's counsel acknowledges that it was a mistake, and that as soon as the impropriety of the action became known to Madoff, he began working to get the items back. (*Id.* at 12-14.) Moreover, Mrs. Madoff has now voluntarily agreed to a freeze on her assets, including her jewelry. (*Id.* at 11.)

Following a hearing on the Government's application, the Parties submitted briefs elaborating on their respective positions. While apparently conceding that there has been no

violation of the specific conditions of bail in the instant case,[6] the Government reiterates that no bail conditions can be set that adequately address the flight risk or potential harm to the community.  The Government articulates this harm as the dissipation of assets that will arguably become part of Madoff's restitution debt for victim recovery. (Gov. Mem. at 5-6.) The Government argues it is not practical to monitor all of Madoff's assets to prevent further dissemination contravening the civil case's preliminary injunction. (*Id.*) Thus, it concludes that detention is necessary because there are no conditions of release that can assure the safety of the community. Madoff counters that most of the items have been recovered, and that he is in the process of recovering the outstanding items at this time. (Def. Opp. at 4.) He argues that the Government failed to make the threshold showing to allow for a consideration of detention, and that it failed to make any showing under the law that Madoff is a flight risk of the caliber mandating detention, or that he can disseminate assets in any fashion that could be considered a harm cognizable under § 3142 of the Bail Reform Act.

## III. DISCUSSION

### A. Legal Standard

Generally, a court must release a defendant on bail on the least restrictive condition or combination of conditions that will reasonably assure the defendant's appearance when required and the safety of the community. *See* 18 U.S.C. _ 3142(c)(1)(B). The issue at this stage of the criminal proceedings is not whether Madoff has been charged in perhaps the largest Ponzi

---

[6] The Government does not identify any violation of the conditions of release, and no violation is apparent. If Madoff had violated a condition of his release, the Government would have been entitled to move for detention pursuant to 18 U.S.C. § 3148(b). While this would have provided a clear basis for the motion, it likely would not have changed the result herein as the Court would still be required to address the questions of flight and danger.

scheme ever, nor whether Madoff's alleged actions should result in his widespread disapprobation by the public, nor even what is appropriate punishment after conviction. The legal issue before the Court is whether the Government has carried its burden of demonstrating that no condition or combination of conditions can be set that will reasonably assure Madoff's appearance and protect the community from danger.[7] 18 U.S.C. _ 3142(e).

Under 18 U.S.C. § 3142(b),

> The judicial officer shall order the pretrial release of the person [charged with an offense] on personal recognizance, or upon the execution of an unsecured appearance bond in an amount specified by the court . . . unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community.

*Id.* The Government may move for detention under either § 3142(f)(1) or § 3142(f)(2).  Under subsection (f)(1) of the Act, the Government may seek a detention hearing in cases where the defendant has been charged in a case involving certain crimes, including: 1) a crime of violence, which carries a maximum term of ten years or more; 2) an offense which carries a maximum sentence of life imprisonment or death; 3) serious drug offenses; 4) felonies committed by certain repeat offenders; and 5) felonies that are not otherwise crimes of violence that involve a minor victim or the possession or use of a firearm, destructive device, or any other dangerous weapon.

---

[7] Were the Court to issue a detention order against Madoff in the context of a bail hearing, the object would not be to punish him, but to achieve these twin goals under the Bail Reform Act.

8

18 U.S.C. § 3142(f)(1). As the Government appears to concede, there is no evidence that any of the enumerated bases in this subsection are applicable to Madoff's situation.

The Government may also seek detention under § 3142(f)(2) in a case that involves: either "A) a serious risk that the defendant will flee; or B) a serious risk that [the defendant] will obstruct or attempt to obstruct justice . . . ." 18 U.S.C. § 3142(f)(2). The Government relies on both of these bases, and alleges that it has demonstrated both a serious risk of flight and a serious risk of obstruction of justice.

Presented with a motion for detention, the Court undertakes a two-step inquiry. "First, the court must determine whether the Government has established 'by a preponderance of the evidence that [Madoff] . . . presents a risk of flight or obstruction of justice.'" *United States v. Khashoggi*, 717 F. Supp. 1048, 1049 (S.D.N.Y. 1989) (quoting *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988)). If the Government carries this initial burden, the Court must determine whether there are reasonable conditions of release that can be set or whether detention is appropriate. *Friedman*, 837 F.2d at 49; *United States v. Berrios-Berrios*, 791 F.2d 246, 250 (2d Cir. 1986), *cert. dismissed*, 479 U.S. 978; 18 U.S.C. § 3142(e). To support detention based on danger, the Government's proof must be clear and convincing, 18 U.S.C. § 3142(f)(2), while detention based on risk of flight must be proven by a preponderance of the evidence. *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (citing *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985); *United States v. Gotti*, 794 F.2d 773, 777 (2d Cir. 1986)). Furthermore, in making this determination, the Court must consider a set of four factors established by Congress. *See* 18 U.S.C. § 3142(g). These include "'the nature of the offense, the weight of the

9

evidence against the suspect, the history and character of the person charged, and the nature and seriousness of the risk to the community.'" *Khashoggi*, 717 F. Supp. at 1049 (quoting *Chimurenga*, 760 F.2d at 403). The Government's task is not insubstantial at this second stage. In most cases, release is the presumptive state. *See* 18 U.S.C. §§ 3142 (b) and (c). "The court should also 'bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial.'"[8] *Khashoggi*, 717 F. Supp. at 1049 (quoting *Shakur*, 817 F.2d at 195).

Thus, under the Bail Reform Act, the Government must first establish by a preponderance of the evidence that the new circumstances presented in this application demonstrate that there is a serious risk that Madoff will flee or that there is a serious risk that he will obstruct or attempt to obstruct justice.

## B. The New Information Provided by the Government Does Not Demonstrate Either a Serious Risk of Flight or Serious Risk of Obstruction of Justice

---

[8] Even for the most serious offenses, more than half of all defendants are released on bail conditions, including 51% for violent offenses, 57% for property offenses, and 73% for fraud. *See, e.g.*, U.S. DEPT. OF JUSTICE, BUREAU OF JUSTICE STATISTICS, FELONY DEFENDANTS IN LARGE URBAN COUNTIES, 2004 - STATISTICAL TABLES, TABLE 9. FELONY DEFENDANTS RELEASED BEFORE OR DETAINED UNTIL CASE DISPOSITION, BY MOST SERIOUS ARREST CHARGE (2004), http://www.ojp.gov/bjs/pub/html/fdluc/2004/tables/fdluc04st09.htm (last visited Jan. 10, 2009).

### 1. Risk of Flight

The Government's burden regarding risk of flight is made more difficult because the record reflects that conditions have already been put in place to address this concern and, until this motion was filed, the Parties had agreed that the measures in place were adequate. The Government did not initially seek detention of Madoff at presentment; rather, bail conditions were set and Madoff was released. (Gov. Mem. at 1-2.) Subsequently, at the request of the Government and with Madoff's consent, these bail conditions were modified on December 17 and again on December 19. (*Id.* at 2. Each time, the Government and the Court agreed with Madoff that adequate and reasonable measures were in place.) The Government contends, nevertheless, that "circumstances have changed markedly since the defendant's bail was set on December 19, 2008," and that detention is now warranted. (*Id.* at 4.)

To support its contention that Madoff presents a serious risk of flight, the Government cites: 1) the scope and nature of the alleged crime; 2) the attendant probability that the applicable Sentencing Guidelines in the circumstance of a conviction will likely result in an advisory range at the top of the Guidelines; 3) the fact that Madoff has assets that cannot be effectively restrained; 4) the severance of Madoff's ties to New York to such an extent that only his wife and brother are willing to sign his bond; and 5) finally, Madoff's recent act of distributing valuable personal property to third parties. (Gov. Mem. at 5-6; Government's Reply ("Gov. Reply"), Jan. 8, 2009, at 4.) The Court agrees with the Government that it should consider "changed" circumstances, but three of these factors – 1, 2 and 4 – are not new, and presumably have been

11

taken into account in the current bail conditions.[9] In addition, factors 3 and 5 are aspects of the same argument, as the Government argues that factor 5 illustrates how factor 3 comes into play. More importantly, the Government fails to explain how the transfers in question change the calculus with respect to the question of risk of flight.

Finally, the Government's concession during the January 5, 2009, hearing severely undermines any claim that there is a *serious* risk of flight as required by § 3142(f)(2) of the Bail Reform Act. On this point, the Government admitted that "the prior bail orders substantially diminished [the risk of flight] by home detention, electronic monitoring and then subsequently by order of the Court the imposition of a 24 hour guard. But that doesn't make the flight risk zero. There is still some flight risk . . . ." (Tr. at 22.) In this regard, however, the Government articulates an erroneous legal standard.  The Act does not require that the risk be zero, but that conditions imposed "reasonably assure" appearance. The Government points to the unprecedented nature of the charges in this case. However, the conditions imposed for release are unique in their own right, and appear reasonably calculated to assure Madoff's appearance when

---

[9] This case contains many unusual tidbits, most of which present no new or changed information. Thus, while the Government notes in its Reply Brief that Madoff was arrested with $173 million in signed checks in his desk apparently waiting to be sent out (Gov. Reply at 2), this was obviously known at the initial bail setting. It may be interesting and provocative, but has limited probative value regarding the issues before the Court.

required.

Aside from the bare assertion that there remains some risk of flight, the Government has failed to articulate any flaw in the current conditions of release.  This omission is important because it does not permit the Government to demonstrate, or the Court to assess, the second part of the Government's burden, that there are "no condition or combination of conditions" which could address this identified risk. *Shakur*, 817 F.2d at 195. Given that the Government 1) has conceded that the flight risk has been "substantially diminished" with the current conditions of release and 2) is constrained to the mere contention that the flight risk is not "zero," this Court finds that the Government has failed to carry its burden of showing by a preponderance of the evidence that Madoff presents a serious risk of flight. (Tr. at 22.)

## 2. Obstruction of Justice

Absent a showing of a serious risk of flight, the Government must show a serious risk of obstruction of justice to merit a detention hearing. 18 U.S.C. § 3142(f)(2).  The Government sets forth two potential theories on its claim of obstruction of justice.  First, it maintains that Madoff's "release on bail presents a clear risk of further obstruction of justice" because the dissipation of his assets through transfers to third parties obstruct justice within the meaning of the bail statute, insofar as it makes it more difficult to recover all available forfeitable assets to recompense victims. (Gov. Mem. at 6.) Alternatively, the Government maintains that the transfer of assets violated the injunction in the civil case before Judge Stanton, and this constitutes obstruction of justice.  (*Id.*)

Madoff argues that neither theory is supportable.  First, he urges that the alleged

dissipation of assets here at issue does not constitute obstruction of justice within the plain meaning of 18 U.S.C. § 3142(f)(2)(B). To support this contention, Madoff notes that the Government has made no showing that any of the distributed items could constitute a part of potential victim restitution funds. (Def. Opp. at 10.) With respect to the second theory on obstruction, Madoff asserts that the alleged violation of Judge Stanton's order in the civil action related to this case does not constitute obstruction of justice, as the violation of a civil court order carries its own set of remedies– such as contempt proceedings. (Def. Opp. at 7.) Madoff elaborates on this point, noting that the Bail Reform Act does not define obstruction of justice, and that the statutory provision detailing the power of the federal courts to punish contempt, 18 U.S.C. § 401, differentiates between obstruction of the administration of justice and disobedience or resistance to lawful court order in its description of contempt offenses. (Def. Opp. at 7.)

The Parties cite no caselaw to support their respective assertions about the meaning of "obstruction of justice" within the context of the Bail Reform Act.  The question of whether Madoff's distribution of assets, whether characterized as "sentimental effects" (Def. Opp. at 10) or "$1 million worth of valuable property" (Gov. Mem. at 8), constitutes a serious risk of obstruction of justice is a threshold question in the inquiry in this matter. The Bail Reform Act "does not permit detention on the basis of dangerousness in the absence of risk of flight . . . [or] obstruction of justice . . . ." *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988). While the Parties' positions each seem to have some merit with respect to the definition of "obstruction," what constitutes obstruction only propels the Government halfway to its objective.  The question is not simply whether Madoff's actions can be considered obstruction, but whether there is a

14

*serious* risk of obstruction in the future.  The statute, by its nature, is always looking forward.  To be sure, the Court should consider past behavior in assessing the likelihood of prohibited behavior in the future, but the Government needs to show that there is a serious risk that these potential harms exist going forward.  While substantial questions remain as to whether the Government has met its burden of showing that Madoff poses a serious risk of obstruction of justice, the Court does not find it necessary to resolve this issue in order to decide the Government's application. As set forth below, even if there were obstruction, and even if there remains potential for obstruction in the future, the Government has failed to demonstrate that no conditions can be set to reasonably protect the community from this form of obstruction.

## C. The Government's Proffer that No Conditions Will Reasonably Assure the Safety of the Community

Were the Court to conclude that the Government had carried its initial burden of demonstrating a serious risk of flight or obstruction of justice, it would have to assess "whether any condition or combination of conditions of release will protect the safety of the community and reasonably assure the defendant's appearance at trial." *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988) (citing *United States v. Berrios-Berrios*, 791 F.2d 246, 250 (2d Cir. 1986), *cert. dismissed*, 479 U.S. 978); 18 U.S.C. § 3142(e). For the Government's detention application to succeed, the Court would have to find that the Government has met its burden of showing 1) by clear and convincing evidence, that no condition or combination of conditions will reasonably assure the safety of any other person and the community; or 2) by a preponderance of the evidence, that there is no condition or combination of conditions that would reasonably assure the "presence of the defendant at trial if released." *United States v. Shakur*, 817 F.2d 189, 195

15

(2d Cir. 1987) (citing *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985); *United States v. Gotti*, 794 F.2d 773, 777 (2d Cir. 1986)). In its determination, the Court must consider available information concerning the following factors: 1) nature and circumstances of the offense charged; 2) weight of the evidence against the accused; 3) history and characteristics of the defendant, including physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, and past conduct and record of past appearances; and 4) nature and seriousness of danger to any person or the community that would be posed by the person's release. 18 U.S.C. 3142(g). Despite having concluded that the Government has failed to carry its burden with respect to risk of flight, the Court considers the issue of danger.

### 1. Safety of the Community

The Bail Reform Act provides that "the facts the judicial officer uses to support a finding . . . that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence." 18 U.S.C. § 3142(f)(2). However, even if the Government can meet this burden, "the Bail Reform Act does not permit detention on the basis of dangerousness in the absence of risk of flight, obstruction of justice or an indictment for the offenses enumerated [in 18 U.S.C. _ 3142(f)(1)]." *Friedman*, 837 F.2d 48, 49 (remanding so the district court could set conditions for defendant's release on bail). Were the Government to succeed under the serious risk of flight or obstruction of justice test discussed above, to prove its burden here it must affirmatively answer each prong of a three part inquiry. First, the Government must show economic harm is a danger to the community

cognizable under the Bail Reform Act, as codified in 18 U.S.C. _ 3142; succeeding in that, the Government must next establish the potential for Madoff to execute actions that would merit economic harm for these purposes; proving that, the Government must then prove by the relevant standard of clear and convincing evidence that no "condition or combination of conditions" can adequately mitigate the danger, save detention of Madoff.

### a. Is Economic Harm a Danger Cognizable Under the Bail Reform Act; Do the Potential Actions of Madoff Rise to the Level of Economic Harm

The Government argues that Congress intended the "safety of the community" language in the Bail Reform Act to be given broad construction. (Gov. Mem. at 3.) The Government uses this foundation to argue that courts have "construed the statute to find that protection of the community from economic harm is a valid objective of bail conditions." (*Id.*) Citing a series of cases to support its assertion, the Government concludes the danger to the community based on the possibility that Madoff may attempt to distribute restitution assets rises to the level of a safety concern as contemplated by _ 3142 of the Bail Reform Act.

Madoff notes that the Government's argument is conspicuously lacking in references to Second Circuit authority on the extension of the concept of danger to the community to encompass economic or pecuniary harm sufficient to justify a revocation of release. Madoff specifically attacks the Government's reliance on cases concerning post-conviction detention, where the standard is governed by 18 U.S.C. _ 3143, which provides a more lenient burden of proof to the Government, and its use of cases where the crimes at issue fell under the felonies enumerated under 18 U.S.C. _ 3142(f)(1), pursuant to which a rebuttable presumption in favor of detention may arise under certain circumstances, *see* 18 U.S.C. _ 3142(e). (Def. Opp. at 7, 12-

17

13.) Madoff argues that the Government has failed to establish that the dissipation of restitution funds rises to the level of endangering the community for purposes of a pretrial detention application.

In urging the Court to adopt its interpretation, the Government asserts that the legislative history of the Bail Reform Act makes clear that Congress intended that the "safety of the community" concern in _ 3142 was expected to be construed as broader than merely danger of harm involving physical violence. (Gov. Mem. at 3 (quoting S. Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3195) ("The reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.").)

Courts should approach such "invitations" to broadly construe statutes with caution. The line between construing a statute and judicial lawmaking can become blurred. Because the Committee indicates that "harm" to the community should not be limited to "physical violence," it does not mean a court should be able to identify other types of harm and read them into the statute.  Indeed, if one were attempting to construe the Committee's intention, the sentence immediately preceding the one the Government has focused on would suggest that, as an initial matter, the Committee's proposition would apply only to activities which are in fact crimes. *See id.; see also* GORDON MEHLER, JOHN GLEESON, AND DAVID C. JAMES, FEDERAL CRIMINAL

18

PRACTICE: SECOND CIRCUIT HANDBOOK 107-08 (8th ed. 2007-2008) (hereinafter "MEHLER, GLEESON & JAMES, SECOND CIRCUIT HANDBOOK") ("The Bail Reform Act's concept of dangerousness covers the effect of a defendant's release on the safety of identifiable individuals, such as a victim or witness, as well as 'the danger that the defendant might engage in criminal activity to the detriment of the community.'" (quoting *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history))).

In reviewing all the cases referenced by the Parties, the Court concludes there is support for considering economic harm in evaluating danger to the community under _ 3142 of the Bail Reform Act. The Government identifies *United States v. Reynolds*, 956 F.2d 192 (9th Cir. 1992), which asserts that "danger may, at least in some cases, encompass pecuniary or economic harm." *Id.* at 192 (referencing *United States v. Provenzano*, 605 F.2d 85, 95 (3rd Cir. 1979) (danger not limited to physical harm; the concept includes the opportunity to exercise a substantial and corrupting influence within a labor union)); *see also United States v. Parr*, 399 F. Supp. 883, 888 (W.D. Tex. 1975) ("The 'danger to . . . the community' [language in the Bail Reform Act] permits consideration of the defendant's propensity to commit crime generally, even where only pecuniary and not physical harm might result to the community at large."). The only case from the Southern District of New York referenced by the Government is *United States v. Stein*, 2005 WL 3071272 (S.D.N.Y. Nov. 15, 2005). In *Stein*, the Honorable Lewis A. Kaplan arguably infers an economic harm as danger to the community pursuant to _ 3142 of the Bail Reform Act by addressing the potential danger to others and to the community if one of the defendants were released on bail. *Id.* at *2. However, Judge Kaplan concludes that "[w]hile the government's

proffer certainly supports the assertion that the defendant has engaged in fraudulent activities in the past, it has made no real effort to suggest that there is a substantial risk that he will continue to do so if released pending trial, particularly given the change in his personal circumstances. So the danger argument comes down to an assertion that [the defendant] is likely to tamper with witnesses or attempt to obstruct justice if released on bail." *Id.* at *2 (granting the defendant conditioned release pending trial).

While the Court does not accept the post-conviction/pre-conviction distinction[10] urged by Madoff to dispense with cases cited by the Government,[11] the Court does consider that a presumption of innocence may be a factor in determining the weight of an alleged economic harm and whether it would rise to the level of danger to the community. For example, in *Reynolds*, the court concluded that the defendant had failed to show by clear and convincing evidence that he did not constitute an economic danger to the community after a jury had convicted him of mail fraud and witness tampering. *Reynolds*, 956 F.2d at 192 (denying bail pending appeal of convictions).[12] The question appears to become one of propensity to commit

---

[10] While the burden of proof and standard may differ when the presumption of innocence remains with the defendant in the context of pretrial detention, bail decisions are made pursuant to the Bail Reform Act, and the terms used should be given the same meaning.

[11] Ultimately, the Court accepts that in certain circumstances an economic or pecuniary harm may give rise to a consideration of danger for purposes of detention, either prior to trial or where the convicted awaits appeal. *See, e.g., Stein*, 2005 WL 3071272, at *2 (pretrial); *United States v. Schenberger*, 498 F. Supp. 2d 738, 742 (D.N.J. 2007) (pretrial); *Parr*, 399 F. Supp. at 888 (pretrial); *United States v. Gentry*, 455 F. Supp. 2d (D. Ariz. 2006) (pretrial).

[12] *United States v. Zaragoza*, 2008 WL 686825, at *3 (N.D. Cal. Mar. 11, 2008), is in a similar procedural posture and also notes that danger to community can include narcotics activity or even encompass pecuniary or economic harm. *Id.* (citing *Reynolds*, 956 F.2d at 192).

further crimes, even if the resulting harm is solely economic. *See Provenzano*, 605 F.2d at 95. This seems to be true even in the cases where pretrial detention is the relevant question. *See, e.g., United States v. Persaud*, 2007 WL 1074906, at *1 (N.D.N.Y. Apr. 5, 2007) (agreeing that "economic harm qualifies as a danger within the contemplation of the Bail Reform Act" but ultimately granting the defendant pretrial release); *see also Gentry*, 455 F. Supp. 2d at 1032 ("[d]anger . . . may be recognized in terms other than the use of force or violence[]" but ultimately concluding that possibility of defendant perpetrating further economic crimes weighed neither in favor of release or detention).[13] In general, concern about future nonphysical harm to the community has been primarily considered where the charges or convictions fall under the enumerated felonies articulated in 18 U.S.C. _3142(f)(1), in particular in the context of child pornography or drug trafficking charges. *See, e.g., Zaragoza*, 2008 WL 686825; *Provenzano*, 605 F.2d at 95-96 (acknowledging the possibility of nonphysical harm but reviewing the two defendants' criminal records, histories of violence and the great possibility of extensive and continual undue influence, and other considerations, before denying them bail); *Schenberger*, 498 F. Supp. 2d 738 (finding danger is not just physical harm or violent act, but includes non physical harm within the concept of safety, here in the context of child pornography allegations).

The Court recognizes, therefore, that there is jurisprudence to support the consideration of economic harm in the context of detention to protect the safety of the community. Although the

---

[13] The Government additionally presents *United States v. LeClercq*, 2007 WL 4365601, at *4 (S.D. Fla. Dec. 13, 2007). "The reference to safety of the community in the Bail Reform Act of 1984 'refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The [Senate Judiciary] Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.'" *See id.* at *4, n.5 (quoting *United States v. King*, 849 F.2d, 485, 487, n.2 (11th Cir. 1988)).

scope of this factor remains uncertain,[14] the Court proceeds to the second step of this analysis.

Here, the Government fails to provide sufficient evidence that any potential future dissemination

of Madoff's assets would rise to the level of an economic harm cognizable under _ 3142 of the

Bail Reform Act. Further, it is far too great an extension to reach from the cases presented by the

Government that narrowly recognize the possibility of economic harm (and rarely conclude the

economic harm presented rises to the level of a danger to the community for which someone

should be detained) to such a conclusion based on the minimal evidence presented here by the

Government.

### b. Whether Detention is the Appropriate Ameliorative Measure

---

[14] For example, in instances where courts have acknowledged economic harm and the convictions have not included the "enumerated felonies" or other crimes where the Court presumes a danger to the community, as aforementioned, they have ultimately made their determination based on consideration of the flight risk and not as a result of finding the accused or convicted individual will perpetrate a pecuniary or economic harm that requires detention. *See, e.g., Parr*, 399 F. Supp. at 888 (assessing the likelihood of flight risk as primary reason for detention and noting accused's violation of a material condition of his bail bond to support conclusion of need for detention); *Gentry*, 455 F. Supp. 2d 1018 (analyzing the factors relevant to determination of flight risk and ultimately denying bail); *see also Stein*, 2005 WL 3071272.

While the Court finds that the Government takes too great a leap in concluding that the potential dissemination of restitution assets rises to the level of danger to the community as contemplated by _ 3142 of the Bail Reform Act, the Court also finds that the Government has failed to carry its burden of showing that no condition or combination of conditions of pretrial release will reasonably assure the safety of the community.

The Government argues that, given Madoff's failure to abide by the preliminary injunction so ordered by Judge Stanton in the civil case, and the fact that there is no practical way to prevent future dissipation of certain of his assets, no condition short of remand will suffice to protect the safety of the community. (Gov. Mem. at 5.) It argues that Madoff's actions constitute a change in circumstances, and that the current bail conditions are insufficient. (Gov. Mem. at 6.)

Madoff responds by describing his current state of affairs, including 24 hour-a-day confinement; no access to any bank account held by him, his wife, or joint accounts; his real property in the United States pledged as collateral for the personal recognizance bond he executed as part of his bail;[15] and his name, face and circumstance known to every financial institution in the world. (Def.'s Mem. at 7.) Further, Madoff notes that since the entry of his current bail conditions, his wife has voluntarily consented to a restraint agreement with the United States Attorney's Office that prohibits her dissemination of any of her personal property. Finally, Madoff provides suggestions for further methods to secure any valuable portable

---

[15] The Second Circuit recognizes that a court may "hold a hearing to ensure that whatever assets are offered to support a bail package are derived from legitimate sources." MEHLER, GLEESON & JAMES, SECOND CIRCUIT HANDBOOK 102 (referencing *United States v. Nebbia*, 357 F.2d 303, 304 (2d Cir. 1966)). As the Government has failed to raise this issue or request any such hearing, the Court presumes that the Government has no basis to question the assets provided for the recognizance bond or any of the conditions of release.

23

property without the need for his detention. (Def.'s Mem. at 10, 17.)

The Government has failed to meet the additional burden of proving by clear and convincing evidence that there is no condition or combination of conditions that will reasonably prevent dissipation of such property. *See* 18 U.S.C. _ 3142(e). In fact, its failure to respond to the various additional bail conditions presented by Madoff further supports the weakness of its argument and its inability to show why Madoff's detention would markedly ameliorate any alleged danger to the community that may result from dissipation of his assets.

**D. Determination of Bail Conditions**

The Court rejects the Government's proposition that the setting of bail conditions is "based, fundamentally, on the trustworthiness of the defendant." (Def.'s Reply at 4.)  Indeed, implicit in the bail condition analysis is the assumption that the defendant cannot be trusted on his own. The Bail Reform Act provides that the Court "shall order the pretrial release of the [defendant] on personal recognizance, or execution of an unsecured bond." 18 U.S.C. _ 3142(b). Only if the Court determines that trust of the defendant is insufficient to assure appearance and maintain safety should the Court impose additional conditions. One need only review the conditions enumerated in § 3142(c)(1)(B) to conclude that these measures are designed for situations in which the Court has determined that additional safeguards are necessary to control the defendant. The Court finds it difficult to conclude, for example, that the current conditions of release are based on Madoff's trustworthiness.

The specific harm identified by the Government is the pretrial dissipation of assets. While the Court believes that the prior restrictions on Madoff appear well-considered and have greatly

diminished Madoff's ability to effectuate any kind of transfer, the following added conditions are

designed as further protections:

> (1) The restrictions set forth in the preliminary injunction entered on December 18, 2008, in the civil case brought by the SEC before District Judge Louis L. Stanton, including restrictions on transfer of all property whatsoever, wherever located, in the possession or under the control of Madoff, **SHALL** be incorporated into the current bail conditions;

> (2) The restrictions set forth in the voluntary restraint agreement signed by Mrs. Madoff on December 26, 2008, **SHALL** be incorporated into the current bail conditions; and

> (3) Madoff **SHALL** compile an inventory of all valuable portable items in his Manhattan home. In addition to providing this inventory to the Government, Casale Associates, or another security company approved by the Government, **SHALL** check the inventory once every two weeks. Casale Associates, or another security company approved by the Government, **SHALL** search all outgoing physical mail to ensure that no property has been transferred. The Government and Madoff shall agree on a threshold value for inventory items within one week of this Order.

### III. CONCLUSION

The Government seeks an order detaining Defendant Madoff prior to trial based on risk

of flight and danger to the community.  On this matter, the Government has the burden of proof –

by a preponderance of the evidence with respect to the question of flight, and by clear and

convincing evidence with respect to question of danger – that there are no conditions which can

be set to address these concerns.  The Court finds that the Government has failed to meet its

burden as to either ground. Accordingly, its motion is **DENIED**.


**SO ORDERED this 12th day of January 2009**
**New York, New York**


_____
**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

**DICKSTEIN**SHAPIRO LLP

1177 Avenue of the Americas | New York, NY 10036-2714
TEL (212) 277-6500 | FAX (212) 277-6501 | dicksteinshapiro.com

January 8, 2009

<u>BY FACSIMILE</u>

Honorable Ronald L. Ellis
United States Magistrate Judge
Southern District of New York
500 Pearl Street
Room 1970
New York, New York 10007

     Re:   *United States v. Bernard L. Madoff*, 08 Mag. 2735

Dear Judge Ellis:

     On behalf of Bernard L. Madoff and further to our oral argument before Your Honor on January 5, 2009, we respectfully submit this letter brief in opposition to the Government's motion to incarcerate Mr. Madoff pending trial, pursuant to Title 18, United States Code, Section 3142(f)(2). We respectfully submit that there are simply no legal or factual grounds that warrant Mr. Madoff's detention. His current, highly restrictive bail conditions are more than adequate to assure his attendance in these proceedings and that he poses no danger to the community. Furthermore, the presumption of innocence, one of the most fundamental principles of the Constitution of the United States, and the Bail Reform Act militate against pretrial incarceration, barring extraordinary circumstances, none of which are remotely present in this case.

### <u>Background</u>

     According to the Complaint against Mr. Madoff filed by the Government on December 11, 2008 (the "Complaint"), on December 10, 2008 Mr. Madoff confessed to his two sons, his brother, and his wife that his investment advisory business was a fraud and that he intended to turn himself into authorities shortly. Out of an exercise of caution, he advised his sons to seek legal advice, although they did not participate in the alleged fraud. In all likelihood, Mr. Madoff understood that his sons would be advised to report his alleged fraud to the authorities. The next day, Mr. Madoff was arrested on the Complaint and charged with one count of securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5. According the Complaint, he voluntarily admitted his culpability to the F.B.I. at the time of his arrest.

     At his arraignment before Magistrate Judge Douglas F. Eaton on December 11, 2008, the government did not seek to remand Mr. Madoff and agreed to the following bail conditions: (1)

**DICKSTEIN**SHAPIRO LLP

a $10 million personal recognizance bond signed by Mr. Madoff, his wife, and three additional co-signers, and secured by Mr. Madoff's residence in Manhattan; (2) surrender of Mr. Madoff's travel documents; and (3) travel restricted to the Southern and Eastern Districts of New York, and the District of Connecticut. In fact, in preparation for the arraignment, Pre-Trial Services interviewed Mr. Madoff, and did not recommend pretrial detention. Instead, Pre-Trial Services recommended even less restrictive terms of release to include a personal recognizance bond signed by two financially responsible individuals.

All conditions were met by the deadline of December 16, 2008, except that Mr. Madoff could not obtain two of the three additional co-signers for the personal recognizance bond. That day, upon the request of both parties, Magistrate Judge Gabriel W. Gorenstein extended Mr. Madoff's time to fulfill his bail conditions to December 17, 2008. On December 17, 2008, the government and defense jointly requested the following modified bail conditions, which were so ordered by Magistrate Judge Gabriel W. Gorenstein: (1) home detention at the defendant's Manhattan apartment, with electronic ankle-bracelet monitoring, (2) the entry of confessions of judgment with respect to the Mrs. Ruth Madoff's properties in Montauk, New York, and Palm Beach, Florida; (3) surrender of Mrs. Madoff's passport; (4) imposition of a curfew of 7 p.m through 9 a.m.; and, (5) reduction of the number of cosigners on the bond from four to two.

On December 18, 2008, the parties discussed their concern for Mr. Madoff's safety due to the media response to his visit to court to sign the modified bail bond ordered by Judge Gorenstein on December 17, 2008. The parties requested modified bail conditions, which were so ordered by Magistrate Judge Theodore H. Katz on December 19, 2008 ("December 19 Order"). Pursuant to the December 19 Order, Mr. Madoff's current bail conditions are: (1) a $10 million personal recognizance bond signed by Mr. Madoff, his wife, and his brother, and secured by confessions of judgment on his wife's properties in New York, N.Y., Montauk, N.Y., and Palm Beach, Fl. worth a total of over $19 million; (2) the surrender of Mr. and Mrs. Madoff's passports, both of which had already been surrendered; (3) other than for scheduled court appearances, Mr. Madoff is confined to home detention in his Manhattan apartment 24 hours a day, with the electronic monitoring device still attached to his ankle; (4) Mr. Madoff has employed a security firm acceptable to the Government, Casale Associates ("Casale") led by a decorated retired senior officer of the New York Police Department, at his wife's expense, to provide the following services to prevent harm or flight: (a) round-the-clock monitoring at his building, 24 hours a day, including video monitoring of all of the defendant's apartment doors, and communications devices and services permitting Casale to send a direct signal from an observation post to the F.B.I. in the event of a suspicion of harm or flight ("panic button"); (b) additional guards available on request if necessary to prevent harm or flight. The Security Plan has been implemented and includes an armed guard stationed in a car outside of Mr. Madoff's residence 24 hours a day, 7 days per week, who monitors all exits and entrances to the residence via security cameras installed outside each door to Mr. Madoff's apartment. The guard also

**DICKSTEIN**SHAPIRO LLP

monitors the panic button. In addition, a "flight protocol" is in place which requires the armed guard to immediately notify 911 and the F.B.I. if Mr. Madoff attempts to leave his residence. Furthermore, a transportation protocol has been implemented to secure the safe travel to and from the courthouse when Mr. Madoff is required to appear in court. All bail conditions were immediately complied with and remain in place.

On December 12, Mr. Madoff consented to and Judge Louis L. Stanton issued a temporary restraining order, asset freeze, appointment of a receiver and other relief against defendants in <u>SEC v. Madoff and Bernard L. Madoff Investment Securities LLC</u>, 08 Civ. 10791 (LLS), and on December 18, 2008 Mr. Madoff consented to and Judge Stanton ordered a Preliminary Injunction, freezing assets and granting other relief. Although bound by the SEC Order, it is not a condition nor is it incorporated into Mr. Madoff's bail conditions of release on bail. The SEC Order, in relevant part, bars Mr. Madoff from transferring, assigning, dissipating, or otherwise disposing of any assets, funds, or property of any kind whatsoever, held by, or under the direct or indirect control of Mr. Madoff or Bernard L. Madoff Investment Securities LLC ("BMIS"). In addition, Judge Stanton appointed Irving H. Picard, Esq. as the Securities Investor Protection Corporation ("SIPC") Trustee for BMIS, and appointed Lee Richards, Esq. as the receiver for the assets of Madoff Securities International Ltd, Madoff Ltd., and any other foreign entity operated by Mr. Madoff. All bank accounts owned by Mr. Madoff, jointly owned by Mr. Madoff and his wife, and owned by any of the above referenced Madoff companies have been frozen pursuant to the SEC Order. Thus, Mr. Madoff has no way of accessing or removing funds from these bank accounts. In addition, on December 31, 2008 Mr. Madoff provided a statement of financial interest to the SEC and the United States Attorney's Office which included a detailed accounting of all assets owned by Mr. and Mrs. Madoff, including real and personal property as required by the SEC Order.[1]

Shortly after Mr. Picard's appointment as SIPC Trustee and at Mr. Madoff's request, we contacted attorneys for Mr. Picard and advised them that Mr. and Mrs. Madoff were willing to relinquish many of their assets including their properties in Palm Beach, Fl. and Antibes, France, four boats, and a three cars.

<u>Transfer of Jewelry</u>

On the evening of December 24, 2008 in an effort to reach out to their immediate family and close friends with whom contact had been cut off, Mr. and Mrs. Madoff decided to send a number of sentimental personal items to a few individuals via United States mail. Although Mr. Madoff had consented to the SEC Order, which prohibited Mr. Madoff from transferring assets,

---

[1] The accounting was based on the best recollection of Mr. and Mrs. Madoff without access to any documents.

**DICKSTEIN**SHAPIRO<sub>LLP</sub>

Honorable Ronald L. Ellis
January 8, 2009
Page 4

he simply did not realize that it pertained to these personal items.  That evening, on Christmas Eve, Mrs. Madoff, who was not subject to the SEC Order set aside a few pieces of jewelry, which she had accumulated over the course of 49 years of marriage to Mr. Madoff.  She intended to share these meaningful mementos with her closest friends and family.  For the same reason and at the same time, Mr. Madoff gathered a number of watches that he had collected over the course of years, knowing that, due to the sudden change in his circumstances, he would never have an occasion to wear these watches again.  To Mr. and Mrs. Madoff, the value of these items was purely sentimental.  All of these items were mailed in gift packages to their sons, Mark and Andrew Madoff, to their daughters-in-law, to Mr. Madoff's brother and sister-in-law, Peter and Marion Madoff, to Mrs. Madoff's sister, Joan Roman, and a married couple who were two of their close friends. [2]

As a result of a meeting with counsel on December 30, 2008, Mrs. Madoff realized that she had sent out the jewelry and she and Mr. Madoff should retrieve the items.  Immediately thereafter, Mr. and Mrs. Madoff made every effort to recover the jewelry.  They contacted Mr. Madoff's brother and sister-in-law and, through counsel, secured the return of the jewelry.  They also asked Mrs. Madoff's sister to return the jewelry, which she has done.  The Madoffs also attempted to reach the married couple, who were out of town at the time.  Counsel has sent a letter to the them via Federal Express requesting the return of the jewelry.  It is our understanding that the balance of the jewelry has been recovered by the Government.

### Bail Reform Act

A.  Statutory Requirements

In accordance with the Eighth Amendment's prohibition against excessive bail, 18 U.S.C. § 3142(b) (the "Bail Reform Act") requires that a defendant be released on personal recognizance or unsecured appearance bond "unless the [court] determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community."  See U.S. Const. amend VIII ("Excessive bail shall not be

---

[2] Although not subject to the SEC Order or any criminal charge, on December 26, 2008 Mrs. Madoff entered into a voluntary restraint agreement with the United States Attorney's Office in which she agreed, among other things, not to transfer any property or other interest belonging to her.  The agreement voluntarily freezes Mrs. Madoff's bank accounts but provides, among other things, that Mrs. Madoff has access to a fixed amount of money to pay basic monthly living expenses, maintain the insurance on certain properties, pay legal fees and costs of the outside security.  She must itemize and provide receipts of the expenses to the United States Attorney's Office at the end of each month.  As a result, Mrs. Madoff's bank has frozen her accounts and she cannot access her money, except as stated above.

**DICKSTEIN**SHAPIRO**LLP**

Honorable Ronald L. Ellis
January 8, 2009
Page 5

required . . ."); see also U.S. v. Sabhnani, 493 F.3d 63, 75 (2d Cir. 2007).  Because the Bail
Reform Act "limits the circumstances under which a district court may order pretrial detention,"
the Second Circuit has observed that unless the defendant has been charged with certain crimes
enumerated in 18 U.S.C. § 3142(f)[3], the Government may move to seek such detention only
"when there is a **serious risk** that the defendant will flee, or obstruct or attempt to obstruct
justice." U.S. v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988) (emphasis added) (citing § 3142(f)(2)
and ruling that a defendant with no passport or "known ability to evade surveillance," and who
"took no steps to leave the jurisdiction" after his arrest, did not pose a serious risk of flight).

        In the event the Government meets the statutory requirement for filing the motion, the
Second Circuit requires "a two-step inquiry" to determine whether detention is warranted. Id.
First, the Government must show "by a preponderance of the evidence" that the defendant
presents a serious risk of flight or obstruction of justice. Id. at 49; see also U.S. v. Khashoggi,
717 F.Supp. 1048, 1049 (S.D.N.Y. 1989) (ruling that a defendant, "an enormously wealthy
man," who was a fugitive abroad for six months after being indicted for mail fraud, RICO
violations and obstruction of justice, and who possessed the means "to facilitate a hasty
departure from the jurisdiction," did not pose "a substantial risk of flight").  If the Government
makes this showing, the court must then determine whether "no condition or combination of
conditions will reasonably assure the appearance of the person as required and the safety of any
other person and the community."[4]  18 U.S.C. § 3142(e) (stating the threshold for detention).
The statute specifically requires that the Government provide "clear and convincing evidence"
that no condition or combination of conditions will reasonably assure the safety of any other
person and the community.  18 U.S.C. § 3142(f)(2).  Moreover, as the Second Circuit made clear
in Friedman, the Bail Reform Act "does not permit detention on the basis of dangerousness in
the absence of risk of flight" or obstruction of justice. 837 F.2d at 49.

        As set forth below, the Government failed to satisfy the requirements of the Second
Circuit's two-step inquiry in determining whether detention is warranted pursuant to 18 U.S.C. §
3142.  First, the Government's motion does not demonstrate that Mr. Madoff poses *any*, let alone
a "serious" or "substantial" risk of flight.  The conditions of Mr. Madoff's confinement, the

---

[3] These crimes include crimes of violence carrying a maximum term of ten years or more;
offenses for which the maximum sentence is life imprisonment or death; serious drug offenses;
felonies committed by certain repeat offenders; and felonies that are not otherwise crimes of
violence that involve a minor victim or the possession or use of a firearm, destructive device or
any other dangerous weapon. 18 U.S.C. § 1342(f)(1).  None of these crimes are at issue in this
case.

[4] The Government must prove by a preponderance of the evidence that there is no condition or
combination of conditions that would reasonably assure the "presence of the defendant at trial if
released." U.S. v. Shakur, 817 F.2d 189, 195 (2d Cir. 1987).

**DICKSTEIN**SHAPIRO<sub>LLP</sub>

Honorable Ronald L. Ellis
January 8, 2009
Page 6

round-the-clock physical and electronic surveillance of his person and his home by highly experienced former senior law-enforcement agents, the confiscation of his passport, the confiscation of his wife's passport, and the notoriety of this case render his flight an impossibility. Nor has the Government shown evidence of "serious" or "substantial" or indeed any risk that Mr. Madoff "will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure or intimidate, a prospective witness or juror." 18 U.S.C. § 3142(f)(2)(B). Nor has the Government cited any binding authority or anything that even approaches "clear and convincing" evidence in support of its claim that Mr. Madoff poses any danger to anyone, and that there is no "condition or combination of conditions" that will "reasonably assure" the safety of the community or of any one person. See 18 U.S.C. § 3142(f)(2). The Government has made no showing of serious risk of flight or of obstruction of justice. Accordingly, the Court should not even reach the second prong of the analysis of determining whether the Government has met its burden of providing clear and convincing evidence that incarceration is warranted on the basis of "dangerousness". See Friedman, 837 F.2d at 49.

      B. Public Policy

      The Senate report regarding changes to the original Bail Reform Act of 1966 (resulting in Bail Reform Act of 1984), emphasized that "there is a small but identifiable group of particularly *dangerous* defendants as to whom neither the imposition of stringent release nor the prospect of revocation of release can reasonably assure the safety of the community or other persons." S. Rep. No. 98-225, at 7 (1984), as reprinted in 1984 U.S.C.C.A.N. 3182, 3189 (emphasis added). The report goes on to explain that "[i]t is with respect to this limited group of offenders that the courts must be given the power to deny release pending trial." Id. This public policy goal of limiting incarceration to a "limited" group of defendants has been repeatedly reiterated by the Second Circuit. See Sabhnani, 493 F.3d at 78 (holding that absent the § 3142(f)(1) statutory presumption in favor of detention, "the statutory presumption is in favor of release"); see also Khashoggi, 717 F.Supp. at 1049 (noting that the court should "bear in mind that it is only a 'limited group of offenders' that should be denied bail pending trial") (quoting Shakur, 817 F.2d at 195. which in turn quotes S. Rep. No. 98-225)).[5]

      The Government points to the Senate report's discussion of language concerning the term "safety of any other person or the community" and argues that the meaning of this term extends beyond physical violence to economic harm. Government Brief, at 3. While the report does

---

[5] Public policy considerations aside, the Senate report also explained that § 3142 "was carefully drafted" to avoid any constitutional defects resulting from the statute's failure to "limit pretrial detention to cases in which it is necessary to serve the societal needs it is designed to protect." S. Rep. No. 98-225, at 8.

**DICKSTEIN**SHAPIRO<sub>LLP</sub>

Honorable Ronald L. Ellis
January 8, 2009
Page 7

express the committee's intent to give the concern for public safety a "broader construction" than "merely danger or harm involving physical violence," the report cites only two specific instances where danger or harm is not limited to physical violence. S. Rep. No. 98-225, at 12-13. Neither of these instances have any bearing on the case at hand. The first example concerns labor corruption involving union activities, and the second refers to drug trafficking. Id. As the Senate report suggests, labor corruption and drug traffic individually constitute major criminal offenses, and present a tangible societal threat. In addition, while they are not violent crimes in and of themselves, violence or the threat of violence is frequently attendant to labor corruption and drug trafficking. Moreover, in discussing the example of labor corruption, the Senate Report cites U.S. v. Provanzano, 605 F.2d 85 (3rd Cir. 1979), a case concerning *post-conviction* detention. As discussed below, the section 3143 standards for *post-conviction* detention are less lenient than the standards for pretrial detention pursuant to section 3142. In the case at hand, however, the Government has failed to show that Mr. Madoff, if not detained, could cause harm while confined to his home 24 hours a day, without access to any back account held by him, his wife or together with his wife, with his real property in the United States pledged as collateral for the personal recognizance bond he executed as part of his bail, and his name, face and circumstance known to every financial institution in the world. Nor can the Government show that, in light of these circumstances, Mr. Madoff's conduct could anywhere approach the crimes of drug trafficking or labor corruption, where physical danger lurks close by. Moreover, even if the court were to adopt the Government's interpretation of the Senate Report as encompassing activities that in no way approach crimes such as drug trafficking, the Government's motion must fail because it still cannot meet its statutory burden of providing clear and convincing evidence that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." 18 U.S.C. § 3142(f)(2). This is especially true in light of the public policy favoring release over incarceration as expressed in the Bail Reform Act, which requires courts to fashion "the least restrictive further condition, or combination of conditions" in assuring the defendant's appearance in court and the safety of any other person and the community. 18 U.S.C. § 3142(c)(B).

    C.  Defendant is Not a Risk of Flight

    Under the Bail Reform Act, the first step in the two-step inquiry articulated by the Second Circuit requires that the Government show by the preponderance of the evidence that there is either a serious risk of flight, or a serious risk of obstruction of justice. Friedman, 837 F.2d at 49 (2d Cir. 1988) (citing § 3142(f)(2). The government failed to meet its burden in demonstrating a serious risk that Mr. Madoff could flee the jurisdiction. As a preliminary matter, any argument made by the Government that Mr. Madoff poses a "serious risk" of flight is wholly disingenuous. The Government conceded during the January 5, 2009 hearing before this Court, that the risk of flight in this case has been "***substantially diminished* . . .** by home detention, electronic monitoring and then subsequently by order of the Court the imposition of a 24 hour

**DICKSTEIN**SHAPIRO<sub>LLP</sub>

Honorable Ronald L. Ellis
January 8, 2009
Page 8

guard. But that doesn't make the flight risk zero." Transcript of January 5, 2009 Hearing, at 22 (emphasis added). The Government's assertions are remarkable when contrasted with the actual language of the statute, which clearly requires that the Government show "a serious risk" of flight, and not a mere possibility of flight. If the Court were to adopt the Government's position and detain defendants in every case where the possibility of risk is not zero—which, according to the Government, is in fact every criminal case where a defendant faces detention—then the Bail Reform Act would be gutted. Indeed, if Government were to prevail on its "not zero" argument, bail hearings themselves would no longer be necessary.

As it happens, the risk of Mr. Madoff's flight in this case is virtually zero because the bail order negotiated and agreed upon by the Government sets stringent safeguards to ensure that Mr. Madoff is closely monitored while detained in his home. Specifically, the conditions of bail, all of which he has met, order that Madoff (1) post a $10 million personal recognizance bond to be secured by three real properties and co-signed by two persons; (2) file a confession of judgment with respect to the three real properties; (3) be subject to home detention at his Manhattan apartment 24 hours a day with electronic monitoring; (4) employ, at his wife's expense, a security firm acceptable to the Government, which will provide round-the-clock monitoring at the defendant's building, 24 hours per day, including video monitoring of the defendant's apartment doors, and communications devised and services permitting it to send a direct signal from an observation post to the F.B.I. in the event of the appearance of harm or flight; (5) surrender his and his wife's passport. See December 19 Order.

Moreover, Mr. Madoff 's conduct, even that which lead to his arrest, is not the conduct of a man who is unwilling to face justice in this matter. In fact, it was Mr. Madoff himself who encouraged his sons to apprise the authorities of the exact nature his fraud and told his sons that he intended to turn himself in. Since his arrest on December 11, Mr. Madoff has left the confines of his Manhattan apartment only for the purposes of attending court hearings and participating in meetings with his attorneys.[6] Furthermore, Mr. Madoff has at all times complied with his initial curfew and his later-imposed absolute home detention. He is a life-long New York resident, has no prior criminal record and has family in the New York area -- all of which provide further support for the finding that Mr. Madoff poses no serious risk of flight. See Friedman, 837 F.2d at 50 (finding no serious risk of flight where defendant was "a life-long New York resident, that he has no prior criminal record, that he has no passport or known ability to evade surveillance, that he has worked gainfully in the New York area for twenty-five years prior to his arrest, and that he is married and has three children, all of whom live in the New York area."). Finally, the international notoriety of this case and the "obloquy associated with fugitive status" have the effect of depriving Mr. Madoff of any meaningful opportunity to flee

---

[6] In compliance with the December 19 Order, the only time when Mr. Madoff travels anywhere now is to attend court hearings.

**DICKSTEIN**SHAPIRO<sub>LLP</sub>

Honorable Ronald L. Ellis
January 8, 2009
Page 9

this jurisdiction.  See Khashoggi, 717 F.Supp. at 1051 (holding that "obloquy associated with fugitive status" rendered the defendant's flight less likely).

Furthermore, while the Government contends that the nature of the alleged crime, and the length of the potential jail time evidence a substantial flight risk, these factors are not sufficient to support a finding of serious risk of flight.  Friedman, 837 F.2d at 50 (requiring "more than evidence of the commission of a serious crime and the fact of a potentially long sentence to support a finding of serious risk of flight").  The Government's claim that Mr. Madoff has allegedly suffered a loss of status and has severed ties with the New York community similarly fails to demonstrate a serious risk of flight in light of the release conditions discussed above.

Even if the Government has made a showing of a serious risk of flight in this case, which it has not, it still must satisfy the second requirement of the two-step inquiry in showing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."[7]  18 U.S.C. § 3142(e) (stating the threshold for detention).  The Government has made no effort whatsoever to meet its burden.  Instead, the Government points to the gifting of several pieces of jewelry belonging to the Madoff household as a basis for summarily dismissing the sufficiency of existing release conditions.  In so doing, the Government does not even attempt to draw a logical connection between the gifting of these items (which have since been recalled) and the purported increased risk of flight.

Thus, where strict conditions "reasonably assure the appearance of the person as required," as they do here,  pretrial incarceration is unwarranted.  18 USC 3142(c)(1)(B); see also U.S. v. Sabhnani, 493 F.3d 63, 75 (2d Cir. 2007) (vacating district court's detention order and remanding for further proceedings, stating that defendant should be released upon adoption of additional conditions and safeguards of the bail order, including employment of a private security officer, electronic monitoring, and physical surveillance).

D.  Defendant did not/will not obstruct justice

Absent a showing of a serious risk of flight, the Government must show a serious risk of obstruction of justice by a preponderance of the evidence.  18 U.S.C. §3142(f)(2).  It is clear

---

[7] The Government must prove by a preponderance of the evidence that there is no condition or combination of conditions that would reasonably assure the "presence of the defendant at trial if released."  U.S. v. Shakur, 817 F.2d 189, 195 (2d Cir. 1987).  The statute requires that the Government provide "clear and convincing evidence" that no condition or combination of conditions will reasonably assure the safety of any other person and the community.  18 U.S.C. § 3142(f)(2).

**DICKSTEIN**SHAPIRO<sub>LLP</sub>

Honorable Ronald L. Ellis
January 8, 2009
Page 10

from the facts of this case that Mr. Madoff poses no risk of obstruction of justice, especially considering the fact that he promptly initiated an effort to assist the receiver of BMIS in locating and properly disposing of all assets.[8]

In the event it meets this burden, the Government then must show that there are no conditions or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community. 18 U.S.C. §3142(e). The Government incorrectly suggests that transfer of a defendant's assets to third parties constitutes obstruction of justice within the plain meeting of 18 U.S.C. §3142(f)(2)(B). What the Government fails to point out is that the belongings claimed to constitute "dissipated assets" were transferred to none other than his estranged sons, daughters-in-law, brother, grandchildren, and close family friends, and that the Madoffs have asked for the return of each piece of property. Furthermore, the government fails to cite <u>any</u> case law to support its argument that the transfer of these sentimental effects constitutes an obstruction of justice under the applicable statutory section. In fact, the language of this section focuses on a risk that a defendant threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror, conduct that is not at issue in this case. Furthermore, there has been no showing by the Government that the gifting of jewelry in this case that was subsequently recovered constitutes dissipation of potential restitution funds.[9]

Finally, even if the Government could show that the gifting of jewelry constitutes obstruction of justice through dissipation of potential restitution funds, it has again failed to meet the additional burden of proving by a preponderance of the evidence that there is no condition or combination of conditions that will reasonably prevent dissipation of such property. <u>See</u> 18 U.S.C. 3142(e). Indeed, his bank accounts and those of his wife are frozen, his U.S. real property is encumbered, and there are any number of ways, as we discuss below, that valuable portable property can be secured short of his incarceration.

The Government also improperly attempts to use an alleged violation of the SEC Order as a predicate for revocation of bail in a criminal action. Violation of a civil court order has its own set of remedies – for example, contempt proceedings – and does not constitute obstruction of justice. Although obstruction of justice is undefined in the Bail Reform Act, 18 U.S.C. §401 clearly indicates that contempt based on obstruction of justice is separate and distinct from contempt based on disobedience to a court order. <u>See</u> 18 U.S.C. §401 ("A court of the United

---

[8] Indeed, Mr. Madoff disclosed in his statement of financial condition several millions of dollars in jewelry.

[9] In fact, the Government has made no showing that any of these items could constitute a part of restitution funds.

**DICKSTEIN**SHAPIRO LLP

Honorable Ronald L. Ellis
January 8, 2009
Page 11

States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as: (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; (2) Misbehavior of any of its officers in their official transactions; (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."). Therefore, the Government's argument that a violation of a court order constitutes obstruction of justice is misleading, as the two concepts are separate and distinct.

E.  Defendant is not a Danger to the Community:

Fundamentally, the Government's claim that Mr. Madoff could cause harm by dissipating restitution assets is groundless. The terms of Judge Stanton's December 18 order make it impossible for Mr. Madoff to transfer, assign, dissipate or otherwise dispose of any property, assets, or funds under the direct or indirect control of Mr. Madoff or of Bernard L. Madoff Investment Securities LLC. This is in addition to the conditions of Mr. Madoff's release on a $10 million bond, pursuant to which Mr. Madoff's Manhattan apartment and his wife's properties in Montauk, NY and Palm Beach, Florida are each encumbered under separate confessions of judgment filed with the Court. Moreover, Mrs. Madoff, who does not face any charges, has taken the further step of voluntarily agreeing to surrender her passport, and to relinquish her right to transfer, sell, assign, pledge, dissipate, move or otherwise dispose of any property under her direct or indirect control. In short, even if the Government could prove Mr. Madoff's (or Mrs. Madoff's) intent to dissipate funds, which it cannot, there is no reason to believe that Mr. and/or Mrs. Madoff could act on that intent. Simply put, the Government has not and cannot provide clear and compelling evidence, or indeed any evidence, that Mr. Madoff could cause harm to any person and the community.

As part of the two-step inquiry, in the event the Government proves by a preponderance of the evidence that Mr. Madoff poses either a serious risk of flight or poses a serious risk of obstruction of justice, it is the Government's burden to then show by clear and convincing evidence that Mr. Madoff poses a danger to the community. 18 U.S.C. §3142(f)(2). In other words, as the Second Circuit made clear, the Bail Reform Act "does not permit detention on the basis of dangerousness in the absence of risk of flight" or obstruction of justice. Friedman, 837 F.2d at 49. The Bail Reform Act lays out the specific factors to be considered in determining whether there are conditions of release that will reasonably assure the appearance of the defendant and the safety of the community: (1) nature and circumstances of offense, including whether the offense is a crime of violence, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;[10] (2) weight of

---

[10] Courts consider the fact that a defendant was not charged with a violent crime or a crime involving narcotics as an essential factor weighing against detainment and in favor of release. See e.g. U.S. v. Khashoggi, 717 F.Supp 1048, 1051 (S.D.N.Y. 1989) ("The Court notes . . . the

**DICKSTEIN**SHAPIRO**LLP**

Honorable Ronald L. Ellis
January 8, 2009
Page 12

evidence against defendant;[11] (3) history and characteristics of defendant; and (4) nature and seriousness of risk to community. 18 U.S.C. §3142(g); U.S. v. Khashoggi, 717 F.Supp 1048 (S.D.N.Y. 1989) (holding that pretrial detention of an enormously wealthy businessman charged with several RICO violations was not warranted).

At the outset, the Government's brief is conspicuously lacking in references to Second Circuit Court of Appeals authority.[12]  Instead, the Government relies on case law (1) from outside of this jurisdiction; (2) inconsistent with the legislative history and purpose of the Bail Reform Act as discussed above; and, (3) factually distinct and, in most instances, are cited for pronouncements that are dicta.[13]  The Government cites these inapposite cases in attempt to persuade the Court that the alleged economic harm at issue here "presents a danger to the community with the meaning of the Bail Reform Act."  Government Brief at 5.

First, the Government erroneously relies on cases dealing with post-conviction issues in analyzing the propriety of pretrial detention.[14]  Post-conviction detention analysis is conducted

---

defendant here is not charged with a crime of violence or a narcotics violation.  This militates in favor of pretrial release."); U.S. v. Karni, 298 F.Supp.2d 129, 132 (D.D.C. 2004) (denying Government's motion for revocation of release order, noting as the first factor in its analysis that "[t]he crime with which Defendant is charged is neither a crime of violence nor a crime involving narcotics.").

[11] According to at least one case cited by the Government, the weight of the evidence is the least important of the above factors.  U.S. v. Gentry, 455 F.Supp.2d 1018, 1029 (D.Ariz. 2006).

[12] Notably, a Second Circuit Treatise on Federal Criminal Practice, co-authored by Judge John Gleeson, discusses dangerousness in the context of the Bail Reform Act.  At no point do the authors cite to Second Circuit case law equating economic harm with dangerousness.  In fact, the authors focus on acts of direct and indirect violence and narcotics crimes as examples of those crimes that constitute danger to the community.  Gordon Mehler, John Gleeson, and David C. James, Federal Criminal Practice; Second Circuit Handbook, 2007-2008 ed., p. 107-108.

[13] The Government relies on U.S. v. Persaud, 2007 WL 1074906 (N.D.N.Y. Apr. 5, 2007), the only case from this circuit cited by the Government.  Although the court in Persaud did hold that economic harm qualifies as a danger within the contemplation of the Bail Reform Act, the Government fails to mention that Persaud does not address the type of pretrial detention analysis at issue in this case.  Instead, upon defendant's motion, the court examined whether preset conditions of release were unnecessarily stringent.  The court agreed with the defendant that certain release conditions were not "reasonably necessary to ensure defendant's appearance or to protect the community."  Id. at *1.

[14] U.S. v. Reynolds, 956 F.2d 192 (9th Cir. 1992) and U.S. v. Provenzano, 605 F.2d 85 (3rd Cir. 1979) both concern determinations of post-conviction bail.

**DICKSTEIN**SHAPIRO LLP

Honorable Ronald L. Ellis
January 8, 2009
Page 13

under an entirely different and less lenient provision of the Bail Reform Act. See 18 U.S.C. §3143; see also U.S. v. Miranda, 442 F.Supp. 786, 789 (S.D.Fla. 1977) (In a major drug trafficking case involving 23 tons of marijuana, the court noted "that the standards guiding its determination of bail after conviction and pending appeal are more stringent than the standards applicable to the determination of bail before the trial when the defendant is presumed innocent."). A primary reason for the difference between the pretrial and post-conviction detention standards is the fact that "there is clearly no constitutional right to bail once a person has been convicted." S.Rep. No. 98-225, at 26. On the other hand, a defendant facing trial enjoys the presumption of innocence which heavily weighs in favor of release. See 18 U.S.C. §3141(j) ("Nothing in this section shall be construed as modifying or limiting the presumption of innocence.").

In addition, the Government does not cite, nor was Mr. Madoff able to locate, any controlling Second Circuit case law to support the proposition that nonviolent, pecuniary harm constitutes a "danger to the community" sufficient to justify a revocation of release. The Government appears to rely heavily on U.S. v. Schenberger, 498 F.Supp.2d 738 (D.NJ. 2007) in hopes of persuading the court that dissipation of restitution funds can rise to the level of endangering the community.[15] However, this case is inapposite for a host of reasons, the most central being that the facts involve a defendant indicted for child pornography violations, a crime that serves to shift the statutory burden of proof to the defendant pursuant to section 3142(f)(1) of the Bail Reform Act. Id. at 739. When a defendant is charged with a crime of this caliber, there attaches a rebuttable presumption that no release conditions will reasonably assure the safety of any other person and the community, placing the burden on the defendant to produce countervailing evidence that forms a basis for his contention that he will not pose a threat to the community. 18 U.S.C. §3142(e)(1); (f)(1); Schenberger, 498 F.Supp.2d at 741. No such presumption attaches in the instant case.

Furthermore, the court in Schenberger notes the "government may move for detention on the basis of danger to the community *only* for an offense that is listed in 18 U.S.C. §3142(f)(1)(A) to (E)." 498 F.Supp.2d at 741 (emphasis added). According to this pronouncement alone, the Government is not permitted to move for detention against Mr. Madoff on the basis of alleged dangerousness, as the Government must concede, the crime for which he is being charged is not listed in the sections cited by the Schenberger court.

Reliance on U.S. v. Zaragoza, 2008 WL 68625 (N.D.Cal. Mar. 11, 2008) is also misplaced. While the Government has filed its brief pursuant to section 3142(f)(2) (see Government Brief, at 1), which favors release, the detention analysis in Zaragoza is conducted

---

[15] The Government not only cites Schenberger in its brief, but also discussed it during the January 5, 2009 Hearing before this court.

**DICKSTEIN**SHAPIRO<sub>LLP</sub>

Honorable Ronald L. Ellis
January 8, 2009
Page 14

pursuant to section 3142(f)(1), which imposes a statutory presumption in favor of detention where the defendant has been charged with crimes of violence, offenses with maximum sentences of life imprisonment or death, serious drug offenses, felonies committed by certain repeat offenders, and felonies that involve minor victims, possession or use of a firearm, a destructive device or any other dangerous weapon. 18 U.S.C. §3142(f)(1); see also Sabhnani, 493 F.3d at 78 (holding that absent the § 3142(f)(1) statutory presumption in favor of detention, "the statutory presumption is in favor of release"). Mr. Madoff does not face any of these enumerated charges.

The Government also relies on U.S. v. LeClercq, 2007 WL 4365601 (S.D.Fla. 2007), in which the court expressed a concern with future economic harm to the community where the defendant sought to be released into the same business environment from which she came before her arrest on charges of mail and wire fraud, and money laundering. Here, however, Mr. Madoff does not seek to resume his prior business activities, nor could he do so as a legal or practical matter in light of the fact that his business is in receivership and his assets are frozen. It is also significant that the LeClercq court's finding of economic harm to the community merely justified a substantial monetary bond in that case. The defendant was detained only because she was unable to meet that obligation. The Government has not indicated, and there is no reason to believe, that Mr. Madoff is unable to meet the conditions of his monetary bond, even if the government succeeds in showing that his release would cause an economic harm to the community. This is especially true considering that the gifting of certain pieces of jewelry is the only fact that the Government cites in support of its strained argument that Mr. Madoff could cause economic harm by supposedly dissipating restitution funds.

Finally, U.S. v. Gentry, 455 F.Supp.2d 1018 (D.Ariz. 2006) does little to advance the Government's argument. Not only does Gentry remind us that "the right to bail should be denied only for the strongest reasons" (Id. at 1020), and makes clear that a defendant facing trial must be released under the "least restrictive" condition or combination of conditions (Id. at 1020), and emphasize that "doubts regarding he propriety of release should be resolved in favor of the defendant" (Id. at 1032), but this case does not even examine detention based on economic harm to the community. Instead, the court in Gentry ordered detention based on a finding of serious risk of flight, finding that the "harm to the community" factor weighed neither in favor of or against defendant's detention. Id. at 1032.

## Proposals in Accordance with Bail Reform Act

As set forth above, even if the Government were to show that failure to detain Mr. Madoff would result in "harm", economic or otherwise, to the community, which it has not, the Government is still required to present clear and convincing evidence that no condition or combination of conditions would assure the safety of any other person and the community. 18

**DICKSTEIN**SHAPIRO LLP

Honorable Ronald L. Ellis
January 8, 2009
Page 15

U.S.C. §3142(f)(2).  Moreover, the Court must fashion "the least restrictive further condition, or combination of conditions" in assuring the defendant's appearance in court and the safety of any other person and the community.  18 U.S.C. § 3142(c)(B).

In this case, the Government cannot meet its burden of providing clear and convincing evidence because there are a number of conditions or combination of conditions that would address the statutory concerns, as set forth below:

- Modification of the current release conditions to incorporate the restrictions set forth in the SEC Order, including restrictions on transfer of all property whatsoever, wherever located, in the possession or control of Mr. Madoff.
- Modification of the current release conditions to incorporate the restrictions set forth in the voluntary restraint agreement signed by Mrs. Madoff on December 26, 2008.
- Compile an inventory of all valuable reasonably portable items in the Madoffs' Manhattan home.  In addition to providing this inventory to the Government, Casale Associates will check the inventory on a bi-weekly basis.  Casale Associates will search all outgoing physical mail to ensure no valuables have been transferred.
- Alternatively, all jewelry will be vaulted in escrow.
- As suggested by the Court during the January 5, 2009 Hearing, appointment of a "personal receiver" over Mr. Madoff's personal assets and property.

Respectfully submitted,


DICKSTEIN SHAPIRO LLP


By: _____
Ira Lee Sorkin


By: _____
Daniel J. Horwitz

Of Counsel:
Nicole De Bello
Ketevan Kulidzhanova
Bradley M. Brown